# 𝔖taunton

## SOUTHERN RAILWAY COMPANY V. MILTON R. BARKER AND MUTUAL INSURANCE COMPANY, ETC.

September 13, 1939.

Record No. 2115.

Present, All the Justices.

The opinion states the case.

*Thomas B. Gay, Robert L. Pennington* and *Lewis F. Powell, Jr.,* for the plaintiff in error.

*Clayton Scyphers,* for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

This writ of error brings under review the proceedings in an action instituted by the Mutual Insurance Company of Hartford County, Maryland, assignee of Milton R. Barker, and Milton R. Barker, to recover for the loss of hay and damage to a truck occasioned by fire alleged to have originated from sparks emitted from an engine of the Southern Railway Company. The trial resulted in a verdict and judgment in the sum of $500.00 for plaintiffs.

The railway company is seeking to have this court reverse that judgment, on the following grounds:

(1) "The court erred in overruling petitioner's motion to set aside the verdict of the jury, and in entering the judgment * * * against petitioner.

(2) "The court erred in admitting, over defendant's objections, testimony of witnesses * * * as to alleged other fires."

The railway company owns and operates a steam railroad extending from Bristol to St. Charles, Virginia, via Benhams, Leonards, and other stations. Between Benhams and Leonards, some eight or nine miles north of Bristol, the railway bed traverses a very steep grade. The tracks are laid in a hollow, known as the Gorge. Barker owns and resides on a small hillside farm, adjacent to the railroad's right of way in this hollow.

On January 24, 1938, about 4 p. m., Barker returned from Bristol on his truck, which was loaded with hay. Part of the hay was in bales, and a part was loose. He stopped the truck on his own land, between 40 and 50 feet from the railroad track. After throwing a part of the hay on the ground beside the truck, he left that immediate vicinity. The truck and hay had been in this position for approximately three hours, when Sam McCracken, who lives in the Gorge about 300 feet from the site of the parked truck, observed that the hay and truck were on fire. He immediately notified Barker, who was at his barn milking or feeding his cattle. The two went to the truck, but were unable to extinguish the flames until after the hay had been consumed, and the truck badly damaged.

The insurance company, under its policy, assumed liability for damage to the truck, and paid $269.47 for the necessary repairs to it; in consideration of which, Barker assigned to the insurance company a part (*pro tanto*) of his claim against the railroad company.

Plaintiffs, in order to fasten responsibility for the fire upon the railway company, did not undertake to prove that it was negligent, as proof of negligence has been rendered unnecessary by the adoption of the "Featherstone Act" (Code, sections 3991, 3992). Plaintiffs rely upon the following circumstantial evidence to prove that the fire originated from sparks emitted by the railway company's engine:

(1) The grade of the railway's road bed is so steep that one engine is unable to pull the grade when connected with a freight train of average length.

(2) Engines laboring up this grade have emitted so many sparks and cinders, that on the crest of an eight- or nine-foot bank along the right of way, and extending to the point where the truck was parked, dead cinders have accumulated to a considerable depth. As one witness expressed it, they are "shoe mouth deep." The thickness of the bed of cinders was less toward the site of the truck.

(3) An engine pulling three passenger coaches passed Barker's farm some twenty or thirty minutes prior to the time fire was seen burning the hay and truck. When observed, the fire had gained such headway that it was impossible to save any part of the hay, or prevent serious damage to the truck.

(4) This engine was seen to have emitted live sparks, which were blown from 18 to 20 feet in the air, as it passed Barker's farm. While none of the witnesses said they saw live sparks fall to the ground, one witness said, "It was throwing fire right smart, and had been for a right smart bit."

(5) One witness, who was introduced as an expert, and who was regularly employed by the insurance company, stated that from a careful examination of the damaged truck, he was positive that the fire was not caused "by an electrical short circuit."

The evidence for the railway company tends to show that the engine in question was equipped with a standard spark arrestor made of $\frac{1}{4}$-inch wire netting. It was also equipped with a modern mechanical draft instead of a natural draft. These mechanical devices are constructed so that they will reduce the size of normal sparks before emission, to very small particles—the size of the opening in the wire mesh. Ordinarily sparks are thrown high in the air, and "die long before they strike the ground." The engine, including the spark arrestor, was carefully inspected on January 4, 1938 (before the fire), and again on February 3, 1938 (after the fire), and was found to be in perfect condition. The engineer and fireman testified that the engine was laboring up the incline at only half capacity, and was emitting sparks that were blown from 15 to 20 feet in the air, but which went out before striking the ground, and that there was nothing unusual in the size or number of sparks emitted on this occasion.

This evidence tends to prove that the railway company was not guilty of negligence. Negligence, however, is not now an essential part of plaintiff's proof. When plain-

tiffs have traced the origin of the fire to the railway company, they are, by statute, entitled to recover damages. (Code, sections 3991, 3992.)

The railway company contends that the case under consideration is controlled by the decision in *Southern Railway Company* v. *American Peanut Corporation,* 158 Va. 359, 164 S. E. 261. The controlling facts in that case were that a fire was discovered in the Hull House some 30 minutes after a slow-moving train had passed. At the time the fire was first observed, it was "no bigger than a blaze from a lantern." Mr. Justice Gregory, in the course of the court's opinion, said: "There is an entire absence of any evidence that the engine was emitting sparks or dropping coals as it passed the Hull House. No witness testified that sparks were emitted by the engine just before it reached the Hull House or as it passed there or at any other time during the trip from Norfolk to Lawrenceville, the destination of the train. The engineer testified that any engine will throw sparks when it is working but not sufficient to set anything afire. He further testified that when an engine does throw sparks it is the engineer's duty to make a report of it, and that he made no such report in this instance because there were 'no indications of it throwing fire.'

"The fireman testified that it was his duty to look out for sparks but that it was possible for sparks to be emitted from an engine and he would not see them, but that if he does see any sparks he reports the fact to the engineer who in turn makes a report of it when he arrives at the terminal. He further testified that he did not see any sparks on the occasion in question large enough to set out a fire and therefore made no report on the subject to the engineer."

In *Norfolk & Western Railway Co.* v. *Richmond Cedar Works,* 160 Va. 790, 801, 170 S. E. 5, 8, Mr. Justice Holt, speaking for the court, said: "No new principle is stated in the *Peanut Corporation Case.* As we have heretofore stated, it lays down the familiar rule that a plaintiff must prove his case. Equally well established is the fact that he does not prove it merely by showing some loss by fire of

property along the right of way. He must fortify it by evidence, direct or circumstantial."

■ A comparison of the facts stated in the opinion in the *Peanut Corporation Case* and those heretofore stated in this opinion reveals a sharp distinction between the facts of the two cases. The evidence for plaintiff, which was accepted by the jury and the trial court, brings this case within the controlling principles stated in the following cases: *N. & W. Ry. Co.* v. *Richmond Cedar Works, supra; Virginia Ry. Co.* v. *London,* 148 Va. 699, 139 S. E. 328; *C. & O. Ry. Co.* v. *Ware,* 122 Va. 246, 95 S. E. 183; *N. & W. Ry. Co.* v. *Spates,* 122 Va. 69, 94 S. E. 195.

The railway company contends that the trial court erred in admitting testimony as to other fires.

■ The objection to evidence of other fires was first made in the examination of Milton R. Barker, one of plaintiffs, who stated that there had been other fires in the Gorge, but he did not know who set them out. This witness did not attempt to state any other facts or circumstances which tended to connect such other fires with the railroad company. If we confine our attention to the testimony of this witness alone, we find no connection between other fires and the railroad company. Until this was done, it was error to have admitted such testimony.

However, when S. E. McCracken was on the stand, he testified that as a former section hand he helped the foreman put out fires started from engines of the railway company. The objection to his testimony seemed to have been confined to the form of some of the questions, which were leading, but if the objection was intended to be made to the pertinency of the evidence sought to be obtained, it should have been, as it was, overruled.

The examination of Stanley McCracken, another former section hand, on the subject was as follows:

"Q. Has the Southern Railroad ever been confronted with other fires set out by engines along that Gorge there?

"By Mr. Warren: We make the same objection to this question as before.

"By the Court: Overruled.

"By Mr. Warren: Exception.

"A. Yes, sir, they have had fires there.

"Q. Often, or over a great long period?

"A. Usually every year the leaves blow off of the hill into the hollow and the trains set them on fire and burn them up.

"Q. While you were working for the Railroad, did you ever help put out any fires, or since that time, or before that?

"A. While I was on the Section Gang we put out fires in the Gorge there.

"Q. Along the railroad track?

"A. Yes, sir, where the trains set them on fire.

" * * *

"CROSS EXAMINATION.

"By Mr. Warren:

"Q. How many fires did you ever see in that Gorge?

"A. I don't know. I wouldn't say.

"Q. And how do you know what set them on fire?

"A. I suppose the train did.

"Q. You just suppose?

"A. That is what I said.

"Q. You don't know that of your own knowledge, do you?

"A. I worked in the Section Department and that is the only kind of fires we had anything to do with.

"Q. You had no actual knowledge yourself that the train set them afire?

"A. No, sir."

 It is not necessary for an employee of the railroad company to have seen sparks fall from the engine and a fire started thereby before he is qualified to testify as to the origin of other fires. If this were the requirement, few, if any, fires set out by passing engines, could be traced to the railway company. A witness should not be allowed to give his opinion on the origin of the fires, but if such witness states the circumstances under which the fire originated, and if such circumstances tend to show with reasonable cer-

tainty that the railway company was responsible therefor, then such testimony should be admitted. Stanley McCracken stated that while he had no actual knowledge that other fires were set out by trains, the fires started by engines of the railway company "is the only kind of fires we [section hands] had anything to do with." Clearly, the testimony of this witness, stating that the railway company had been responsible for other fires on this grade, was admissible.

While the form of some of the questions propounded to the last two witnesses was improper, their testimony on the subject is sufficient to connect the railway company with the origin of the fires. Under the circumstances, we find no reversible error in the action of the court in admitting the testimony on this subject.

Some objections were made to the instructions given, but these objections were not pressed in the oral argument. However, we have examined all of the instructions, and find no reversible error in those given.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*