# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## A. S. JERNIGAN v. A. B. CAPPS, JR., ET ALS.

January 13, 1948.

Record No. 3282.

Present, All the Justices.

The opinion states the case.

*Eastwood D. Herbert*, for the appellant.

*Vivian L. Page* and *Walter Aubrey Page*, for the appellees.

EGGLESTON, J., delivered the opinion of the court.

The appellees who were the complainants in the court below, filed their bill in equity against A. S. Jernigan, the appellant, to restrain him from erecting on a lot of land which he had contracted to purchase, a one-story four-family apartment building. The bill alleged that such building was in violation of certain restrictive covenants in a deed or deeds in the defendant's chain of title. The lower court granted the prayer of the bill and enjoined the erection of the proposed building. Hence this appeal.

The matter is before us on an agreed statement of facts which will be briefly summarized, the parties being sometimes referred to according to the positions occupied by them, respectively, in the lower court.

The defendant (Jernigan) had contracted to purchase lot number 54, in section 2, in a development known as "Cromwell Place," which is located in a residential area of the city of Norfolk. The lot extends 90 feet along Sir Oliver road and 140 feet along Granby street.

The complainants, Capps and others, are owners in fee simple of other lots in the same subdivision. All of the lots in the subdivision were conveyed subject to certain covenants and restrictions which are copied in the margin.[1]

---

[1] "(1) That the property hereby conveyed shall not be, nor shall any part thereof be sold, rented, or otherwise disposed of to any person or persons of African descent;

"(2) That no malt or spirituous liquor shall be made, sold or dispersed· on said property or any part thereof;

"(3) That only one residential building (exclusive of garage) shall be erected on any lot shown on the plat hereto attached. The word lot as used in this paragraph shall be construed to mean the lots shown on said plat and numbered from 1 to 86, inclusive, in Section ONE; from 1 to 54, inclusive, in Section TWO; and from 1 to 27, inclusive, in Section THREE, and no others;

"(4) No building shall be constructed on any lot shown on the plat hereto attached in Sections ONE and TWO thereon which shall be closer than 40 feet from the line of the street upon which said lot abuts; and no building shall be constructed on any lot shown on said plat in Section THREE thereon which shall be closer than 25 feet from Sir Oliver Road; but the provisions in this paragraph contained shall not apply to lot numbered 48 in Section ONE on said plat;

"(5) No building nor any part thereof shall be constructed upon any lot shown on the plat hereto attached in Sections ONE and TWO thereon within 8 feet of either side line of such lot; and no building, nor any part

In the defendant's chain of title there is an additional covenant or restriction not common to the other lots in the subdivision, that "the use of the land shall be restricted to residential purposes, and that the same shall not be used as a parking lot, nor for the purpose of parking automobiles, * * *."

The covenants or restrictions with which we are particularly concerned are those that "only one residential building * * * shall be erected on any lot" in the subdivision, and that "the use of the land shall be restricted to residential purposes, * * *."

In the subdivision ninety houses, each designed to accommodate a single family, and two duplex houses, each designed to accommodate two families, have been erected.

The area, however, in which the subdivision lies had been zoned by the city council as a "Residence B" district, in which the erection of apartment houses was permitted. In accordance with such classification, Jernigan had been granted a permit by the proper city official to erect on his lot the proposed building. There is no evidence that the building, or any part thereof, is to be used for business purposes.

According to the exhibits, the design of the exterior of the proposed building is quite similar to that of the other

thereof shall be constructed upon any lot shown on said plat in Section THREE thereon within 10 feet of either side line of such lot; provided, that where more than one contiguous lot shall be used as a building site for one residence, the restriction in this paragraph contained shall be construed to apply to the side lines of the said building site taken as a whole; but the provisions in this paragraph contained shall not apply to lot numbered 48 in Section ONE on said plat;

"(6) No cattle or swine shall be kept or permitted to remain upon the said property hereby conveyed or any part thereof;

"(7) No board fences shall be constructed upon any part of the property hereby conveyed except such part thereof as is included within the boundaries marked 'Ellsworth' on the said plat hereto attached, and the part thereof marked 'A' on said *part*;

"(8) No house or building shall be constructed upon any lot or lots shown on the plat hereto attached in Sections ONE, TWO and THREE thereof, or upon the sites marked 'B' and 'C' thereon until the plans and specifications for the same shall have been submitted to and approved by the President of Cromwell Corporation."

residences, including the duplex houses, which have been erected in the subdivision.

During the laying of the foundation for the Jernigan building the present suit was instituted. While the bill alleged that the structure would violate certain restrictions fixing the building lines applicable to the lot, there was no evidence to support this allegation, and hence we are not concerned with it.

As indicated by its decree, the lower court was of opinion that the defendant was constructing on the lot "a type of building" which violated the covenants and restrictions mentioned. Consequently, it perpetually enjoined him from "erecting or building the proposed four-family apartment or multiple family residence or any other structure than a one-family residence" upon the lot.

The precise question presented to us is whether the erection of this building, designed to house four families, violates the covenants or restrictions that "only one residential building * * * shall be erected on any lot," or that "the use of the land shall be restricted to residential purposes."

The appellees (the complainants below) argue, and the trial court seems to have held, that when the particular words are read in their setting, along with the other restrictions, they show a purpose of the draftsman to establish and maintain in the area a high-class residential district, limited to the erection of buildings each designed for the accommodation of a single family, and for the exclusion of apartment houses and multiple residence buildings.

On the other hand, the appellant (Jernigan) argues that restrictions of this character should be strictly construed and not extended by implication; that neither apartment houses nor multiple family residences are excluded by express language; that the purpose of the particular language used, restricting the erection of "only one residential building" to a single lot, was to confine the use of the land and buildings thereon to residential purposes, as distinguished from commercial or business purposes; and that it was not intended thereby to exclude the proposed building, which,

he says, is "a residential building," and is to be used for "residential purposes."

Although there are a multitude of cases dealing with restrictions of this character, we have been pointed to none, nor have we been able to find any, limiting the structure to be erected on a single lot to "only one residential building," the precise words used here. However, the general principles to be applied in interpreting such covenants and restrictions are firmly fixed both in this jurisdiction and elsewhere.

In the recent case of *Schwarzschild* v. *Welborne*, 186 Va. 1052, 45 S. E. (2d) 152, this court, through Mr. Justice Buchanan, reviewed the authorities and restated the principles applicable to such cases. We there said (186 Va., at page 1058):

" * * * while courts of equity will enforce restrictive covenants where the intention of the parties is clear and the restrictions are reasonable, they are not favored, and the burden is on him who would enforce such covenants to establish that the activity objected to is within their terms. They are to be construed most strictly against the grantor and persons seeking to enforce them, and substantial doubt or ambiguity is to be resolved in favor of the free use of property and against restrictions. (Citing authorities.)

"Of course 'a thing may be forbidden by necessary implication as clearly and positively as by terms of express inhibition,' and 'if it is apparent upon the whole that the instrument carries by definite and necessary implication a certain meaning, then the thing afforded, or denied, by that meaning may be said to be clearly and definitely extended, or forbidden, as if the language used had been in positive and definite terms of affirmation or negation.' *Whitehurst* v. *Burgess*, 130 Va. 572, 107 S. E. 630."

In the *Schwarzschild Case* we held that the covenant or restriction that "there shall not be erected more than two (2) dwellings" on a single lot, and that the improvements thereon "shall be a dwelling or two dwellings," did not either in express terms or by necessary implication inhibit

the owner of the property from renting rooms in the building for permanent occupancy, since, we said, such building, under the circumstances stated, was the "dwelling" of the tenants or roomers.

It is an elementary rule of construction that the purpose or intent of a written instrument must be determined from the language used in the light of the circumstances under which it was written. In the case now before us the restrictions do not in express terms forbid the erection of "an apartment house" or "a multiple family residence." Nor do they limit the type of a permitted building to "a single family dwelling," "a single family residence," "a single family house," "a single detached dwelling." None of these or other expressions of like clear import are used.

These restrictions, the record shows, became applicable to the lots in this subdivision in 1929, when apartment houses and multiple family residences were in common use in the city of Norfolk and elsewhere. In subdivisions designed by promoters as highly restricted residential districts, apartment houses are excluded in clear and express terms by restrictive covenants in deeds in the chain of title. For instance, in *Elterich* v. *Leicht Real Estate Co.*, 130 Va. 224, 227, 107 S. E. 735, 18 A. L. R. 441, decided January, 1921, the restriction in a subdivision likewise located in the city of Norfolk, was that "no flat roofed or double house, * * * or *apartment house* shall be erected or placed upon the property hereby conveyed." (Italics supplied.)

By like clear language apartment houses were excluded from certain areas by zoning laws. Thus the Norfolk city zoning ordinance, adopted August 19, 1924, uses the phrase "a single detached dwelling" in defining the permitted uses applicable to highly restricted residential districts.

Neither do we think that the language in the restrictions before us, that "only one residential building * * * shall be erected on any lot" in the subdivision, prohibits by necessary implication the erection of the proposed building.

The restriction has a two-fold purpose: (1) To inhibit the erection of more than a single building on a single lot; and (2) To confine the type of the structure and its use[2] to that of "a residential building."

Plainly, the proposed structure conforms to the first-stated purpose, for a single building is to be erected on a single lot. The only question to be determined, then, is whether the proposed structure is "a residential building."

█ It is not necessary that we go to a dictionary or a law book to ascertain the meaning of "a residential building." Giving the words their plain and ordinary meaning, we would say that such a building is one which is used for residential purposes,—that is, one in which people reside or dwell, or in which they make their homes, as distinguished from one which is used for commercial or business purposes.

But if the obvious must be supported by authority or judicial precedent, we find that they are of the same view.

█ Webster's New International Dictionary, 2d Ed., defines "residential" as: "Used, serving, or designed as a residence or for occupation by residents; as, a *residential* hotel." "Adapted to, or occupied by, residences; as, a *residential* quarter." "Of, pertaining to, or connected with, residence or residences; as, *residential* trade, qualifications, or zones." "Of or pertaining to a resident."

█ The same authority defines "residence" as: "The place where one actually lives or has his home; a person's dwelling place or place of habitation; an abode. * * * The house where one's home is; a dwelling house." See also, *Schwarzschild* v. *Welborne, supra* (186 Va., p. 1059).

An "apartment house" is defined by the same dictionary as: "A building containing a number of separate residential suites, but usually having conveniences, such as heat, elevator service, etc., furnished in common."

█ Clearly, we think, a building designed for the ac-

---

[2] See *Schwarzschild* v. *Welborne, supra* (186 Va., at page 1057), holding that such a restriction is a limitation on the use as well as on the type of building to be erected.

commodation and use of four families, such as that with which we are here concerned, is "a residential building," for it is, as Webster says, "designed as a residence or for occupation by residents." It is the "residence" of the occupants, because, as that authority says, it is "the house where one's home is; a dwelling house."

In *Schwarzschild* v. *Welborne*, *supra*, we cited and quoted a number of leading cases holding that restrictions which confine the use of property to "residential purposes only,"[3] do not exclude apartment houses or multiple family residences from the area.

Among the cases there approved was *Charlotte Consol. Const. Co.* v. *Cobb*, 195 N. C. 690, 143 S. E. 522, in which it was held that a restriction that a lot of land "shall be used for residential purposes only, * * * and there shall not at any time be more than one residence or dwelling house on said lot," was not violated by the erection of a four-family apartment house. The court said (143 S. E., at page 524): "A building occupied by four families is no less a dwelling house than one occupied by a single family."

Similarly, here, a building occupied by four families is no less "a residential building" than one occupied by a single family.

As was also aptly said in *Charlotte Consol. Const. Co.* v. *Cobb*, *supra* (143 S. E., at page 524): "The building which the defendant proposes to erect is a single structure, intended for residential purposes only. * * * That it is intended to accommodate a number of families does not *ipso facto* bring it within what is forbidden."

In *Hunt* v. *Held*, 90 Ohio St. 280, 107 N. E. 765, L. R. A. 1915D, 543, Ann. Cas. 1916C, 1051, it was held that a two-family house did not violate the restriction that the property was to be used "for residence purposes only." In the course of the opinion the court said (107 N. E., at page 766):

" * * * The word 'residence,' as we view it, is equivalent

---

[3] For a number of such other cases see Words and Phrases, Perm. Ed., "Residence Purposes," "Residence Purposes Only," "Residential Purposes."

to 'residential' and was used in contradistinction to 'business.' If a building is used as a place of abode and no business carried on, it would be used for residence purposes only whether occupied by one family or a number of families. * * * The word 'residence' has reference to the use or mode of occupancy to which the building may be put. If it had been intended that the building was to be for the use of one family only, words indicating such an intention would have been used, as is frequently done, such as 'a single residence,' 'a private residence,' 'a single dwelling house.' * * * "

We think the same is true here and that the purpose of the draftsman was to confine the use of the property to residential purposes as distinguished from business or commercial purposes.

We find nothing in the language used in any of the other covenants or restrictions, set forth above, to negative this view or to support the argument of the appellees that it was the intent of the language used to exclude by necessary implication a multiple family building from the subdivision. Apartment houses are frequently if not usually located in residential areas.

It follows from what has been said that the additional restriction to which the lot is subject, that "the use of the land shall be restricted to residential purposes," does not prohibit the erection on the lot of the proposed one-story four-family building. See Schwarzschild v. Welborne, supra. See also, note 3, supra.

The appellees argue, as the stipulation states, that they "relied upon these restrictions in purchasing their properties and building their residences." What they really mean to say is that they relied upon the interpretation which they have placed upon the restrictions. But this reasoning gets us nowhere, because we may assume that the appellant (Jernigan), on his part, relied upon the interpretation which is favorable to his view, for otherwise he would not have run the risk of undertaking the construction of the proposed building.

It is argued that under our holding "it is permissible to erect" on the defendant's lot "a ten or twelve story apartment house," the operation of which would require a number of servants and mechanics and would "constitute a large business enterprise."

No such situation confronts us here. We are dealing with no such building and are not concerned with whether the erection and use of such a structure would violate the restrictions applicable to this property. There is no evidence that the use or operation of the proposed building will require the employment of a large corps of servants or mechanics, or that its operation will constitute a large business, or that any part of the structure will be used for business purposes.

According to the stipulated facts the proposed building is a one-story four-family apartment house which is fully and accurately described in the exhibits before us. What we hold, and all we hold, is that this building does not violate the restrictions applicable to the land. Hence, we are of the opinion that the lower court erred in enjoining its erection.

For these reasons the decree appealed from will be reversed and a final decree will be here entered dissolving the injunction and dismissing the bill of complaint.

*Reversed and final decree.*

HUDGINS, C. J., and GREGORY and STAPLES, JJ., dissenting.

STAPLES, J., dissenting:

I regret that I cannot concur in the opinion of the majority of the court in this case. I would affirm the decree granting the injunction. It appears from the record that one of the six lot owning complainants, F. E. Page, formerly owned the lot upon which the court has held that an apartment house may be built. In January, 1946, said complainant Page conveyed the lot to one Wood, who in June,

1946, conveyed to one Berry who has sold the lot to appellant Jernigan. Complainants Page and Alley each owns a lot directly across the street from the one here involved. Complainant Capps owns one adjoining same. In the deeds from Page to Wood to Berry there was contained a special provision not common to all other lots in the subdivision. It was a covenant running with the land that *"the use of the land sold shall be restricted to residential purposes,"* which I take to mean that it may not be used for any other purpose. The mere fact that the apartment house to be constructed on the lot is intended to be used for residential purposes does not amount to *restricting* it to that use. An orphanage is used for residential purposes though it is also a charitable institution. A college dormitory or a nurses home, in addition to their use for residential purposes, are also adjuncts to other institutions. Even a jail is used for involuntary residential purposes but it is likewise a prison. And so an apartment house may be used for residential purposes, but at the same time it usually constitutes a business enterprise. As I construe the court's opinion, it is permissible to erect an apartment house on the lot containing four apartments. This would have the effect of permanently collecting quite a large number of people in the building directly across the street from complainants Page and Alley, and adjoining Capps. If a four apartment building does not violate the restriction, I do not see how a ten story one can be brought within its terms. It is merely a question of size or degree. It is a matter of common knowledge that the operation of an apartment house is a business enterprise, the larger ones requiring the constant employment of a manager, desk clerk, inspectors, elevator operators, mechanics, plumbers and janitors. Such an operation involves the soot and smoke incident to a large heating plant, as well as the noise from numerous children and adults, and from many phonograph and radio instruments. The large building also obstructs the sunlight and circulation of the air of neighboring properties. These

things constitute serious disturbances to the occupants of adjacent homes.

In a case of this kind I do not think the interpretation of similar language in restrictive covenants by the courts of other states is a helpful guide. The question here is what was the intention of the grantors in these particular deeds of conveyance here under consideration. This can more appropriately be determined in the light of local conditions. The same language might well have a different significance in Norfolk, Richmond or Roanoke, all lying in the same state. It might even be properly given a different connotation when used in connection with different suburban developments of the same city. The local judge is in a much better position to arrive at the intention of the parties with respect to each of them than are the judges of courts of other states. There are many matters of common knowledge, such as the type, nature, and character of a development, of which he may and frequently does take judicial notice. *Norfolk, etc., R. Co.* v. *Richmond Cedar Works*, 160 Va. 790, 170 S. E. 5. In the case at bar the learned judge of the circuit court probably concluded that, under the agreed facts and the commonly known conditions surrounding this subdivision, the restrictions were intended to insure to the other owners of lots who have built or may build their residences thereon the enjoyment of that privacy and quiet which many people regard as indispensable to a desirable home. In my opinion, the language of the covenants appearing in the footnote of the majority opinion taken in connection with the special restriction applicable to this lot fully justified such a conclusion unless it was incompatible with the general setting and neighborhood conditions. There is nothing in the record to indicate any such incompatibility. In its decision on this appeal, however, the majority of the court is giving precedence to what other judges in other states under different circumstances, conditions, and customs have thought similar language meant. The views of the local judge familiar with local conditions have been discarded. In the absence of

any evidence on the subject of the intention of the grantors in the deed, I think his construction of the instrument, which is entitled to a presumption of correctness, should be followed by us.

The opinion of the court intimates that we are limited in our interpretation of the restriction in the case at bar by our opinion in *Schwarzschild* v. *Welborne,* 186 Va. 1052, 45 S. E. (2d) 152. I do not think so. The only restriction there involved was a prohibition against placing on a lot any building except a "dwelling". There was no express restriction whatsoever as to the *use* of the "dwelling". But in spite of the rule of strict construction against the grantor which is invoked in the majority opinion here, we extended the effect of the restriction in that case, by implication, to prohibit the *use* of the building for any other than *dwelling purposes.* Even in that case we held that the owner of the dwelling was not entitled to operate a boarding house therein though she might rent rooms to persons whose stay is expected to be of long duration. We also said that the implied restriction on the use of a dwelling permitted broader uses than one confining the use to *residential purposes.* And in our opinion in that case we referred to a Texas case in which there was a restriction requiring "that the property be used for residence purposes only and that no apartment house, or *other business enterprise* be conducted or erected thereon." (Italics mine). Thus in that instance an apartment house was specifically classified as a *business enterprise.* The property in the Schwarzschild case was located in the city of Richmond, and we properly gave much weight to the opinion of the Law and Equity Court of that city in affirming his decision. I think the case of *Deitrick* v. *Leadbetter,* 175 Va. 170, 8 S. E. (2d) 276, 127 A. L. R. 849, must be held controlling of the one now before us if previous court interpretations are to govern our construction of the language of the covenants. There the applicable restriction was: "that said land shall not be used except for residential purposes," "or in any manner that will create a nuisance." The owner was enjoined by the Circuit

Court of the City of Richmond from operating her home as a "tourist home". The building consisted of only four bedrooms, together with a dining room and kitchen, in which she, her husband and child lived. In affirming the decision of the trial judge, Mr. Chief Justice Holt said:

"These homes cost around eight or ten thousand dollars each, and, in a general way, belong to a common class. It was the purpose of the land company to have this remain an attractive residential section. These plaintiffs are naturally interested in their own community, particularly in the block in which they live and immediately in lots adjoining their own homes as well as in the business done there. * * *

"This tourist business, as here conducted, is not a nuisance. Its patrons are a 'very high type people. We have had lawyers, doctors, preachers, missionaries, and we have had a judge from New York.' *But if it is a business, then this lot is not being used for 'residential purposes' only.* That it is a business can not be seriously questioned. * * * ." (175 Va. 170, 174. Italics mine).

Thus our last two decisions have held that operating either a tourist home or a boarding house is *carrying on a business* in violation of the residential and dwelling restrictions there involved.

The pertinent restriction now before us is this: *"The use of the land sold shall be restricted to residential purposes."* The majority opinion has held, in effect, that this is not violated by the construction of an apartment house thereon by the owner of the lot. The right to *construct* the apartment house carries with it, as a necessary incident, *the right to operate it as a business enterprise.* As I have pointed out, I think the management and operation of an apartment house, even one containing four apartments, is a much more extensive business and a more objectionable one to the owners of nearby private residences than operating a tourist home in a six room house, as in the *Leadbetter Case,* or a boarding house, as in the *Schwarzschild Case.* It is clearly in violation of the above quoted restriction. The six appellees who bought the lots affected by the apartment

house so thought and went to the expense of instituting this suit to protect the quiet enjoyment of their properties. I would give to the decision of the trial court the weight to which I think it is entitled and leave out of consideration the opinions of judges of courts of other states. Since it is supported by the language contained in the restrictions and there is no evidence that this interpretation would be in any way unreasonable or inequitable, it should be sustained by us. Stated concisely, my view is that the particular problem presented to us in this case is of a type and character which may be more correctly solved by the application to it of a maximum amount of horse sense and a minimum amount of book learning.

I am authorized to state that Mr. Chief Justice Hudgins and Mr. Justice Gregory concur in this opinion.