## Richmond

ROBERT OSWALD YOUNGER, ANDREW LYLE PADGETT, GENE M. SEAM-
STER, JR., AND RALPH MORTON MORRIS V. APPALACHIAN POWER
COMPANY.

March 4, 1974.

Record No. 8276.

Present, All the Justices.

*Norman K. Moon (Edmunds, Williams, Robertson, Sackett, Bald-
win & Graves, on brief), for plaintiffs in error.*

*William Rosenberger, Jr., for defendant in error.*

POFF, J., delivered the opinion of the court.

Each of these four cases, consolidated for trial below, involves
damage to a power transmission pole caused by an automobile. The
trial court granted motions for summary judgment filed by Appa-
lachian Power Company (Appalachian or plaintiff) and by final or-
ders entered December 13, 1972 awarded judgments against Robert
Oswald Younger, Andrew Lyle Padgett, Gene M. Seamster, Jr., and
Ralph Morton Morris (defendants).

In each case, damages awarded consisted of (1) the cost of a new
pole without credit for salvage or depreciation on the old pole; (2)
the cost of labor, composed of (a) wages paid employees who re-
placed the damaged pole and (b) 23.89% of those wages, represent-
ing the cost of company-financed fringe benefits (vacations, pensions,

insurance, etc.); (3) the cost of transportation of materials, tools, and employees to and from the job site; and (4) 15% of each of the foregoing for supervision and engineering related to each.

Evidence given *ore tenus* and by deposition by Appalachian's employees showed that the damages claimed were equal to charges made to customers for installation of new poles; that Appalachian's employees routinely inspect the transmission system and replace poles deteriorated in normal usage as well as those damaged by automobiles; that they replace the latter on an average of one a day; and that the damages claimed for tortious damage are based on replacement costs.

An automobile insurance company official testified that when power companies present pole damage claims, the insurance company requests proof of the age of the pole and that in computing their claims two power companies other than Appalachian deduct a "used life credit" from the replacement cost. An Appalachian accountant testified that when the Commonwealth of Virginia requires Appalachian to relocate more than a mile of its transmission system, Appalachian allows a similar "life service credit" against the cost.

Conceding liability, defendants challenge the formula for computing damages applied by the trial court. They argue that "overhead" charges are not proper elements of damages; that the full cost of replacement is not the proper measure of the injury sustained; and that they should be allowed an "across-the-board" deduction based on the "used life" of the pole or the "betterment" to Appalachian's transmission system.

Appalachian argues that, since its poles have no fair market value, either before or after tortious damage, full cost of replacement is the only fair measure of damages; that all elements of damages included in their computation of cost of replacement are based on sound accounting principles; and that a majority of courts which have considered the question favor the damage formula it uses.

We are of opinion that the full cost of replacement is not the proper measure of damages.

" 'The general rule in awarding damages is to give compensation for the pecuniary loss—to make amends or reparations for the injury inflicted. The plaintiff is entitled to recover all such damages as are the natural and proximate results of the wrongful act complained of.' [Citation omitted]." *Franklin Plant Farm, Inc. v. Nash*, 118 Va. 98, 115, 86 S.E. 836, 842 (1915).

When diminution in market value can be reasonably ascertained, that is the appropriate measure of damages; but when the damaged property has no ascertainable market value or when market value would be a manifestly inadequate measure, then some other measure must be applied. *See Norfolk & Western Ry.* v. *Richmond Cedar Works,* 160 Va. 790, 806-07, 170 S.E. 5, 10-11 (1933). As the court said in *New Jersey Power & Light Co.* v. *Mabee,* 41 N.J. 439, 441, 197 A.2d 194, 195 (1964), "the sundry rules for measuring damages are subordinate to the ultimate aim of making good the injury done or loss suffered and hence 'The answer rests in good sense rather than in a mechanical application of a single formula.' "

Courts which have considered the question here involved are divided. On the grounds that the useful life of a particular pole is speculative and that replacement costs are ascertainable under familiar accounting principles, a majority allow plaintiff the full cost of replacement. *See Appalachian Power Co.* v. *Morrison,* 152 W. Va. 638, 643-46, 165 S.E.2d 809, 812-13 (1969) (listing cases). Other courts have allowed defendant a deduction for depreciation of the damaged property. *Polk* v. *Oklahoma Gas & Electric Co.,* 410 P.2d 547 (Okla. 1966); *New York State Electric & Gas Corp.* v. *J.C.A. Truck Leasing, Inc.,* 19 N.Y.2d 926, 281 N.Y.S.2d 335 (1967). Some courts have allowed defendant a depreciation deduction and also denied plaintiff costs which may be characterized an on-going business expenses. *Central Illinois Light Co.* v. *Stenzel,* 44 Ill. App. 2d 388, 195 N.E.2d 207 (1963); *Ohio Power Co.* v. *Huff,* 12 Ohio Misc. 214, 231 N.E.2d 897 (1967).

The record shows that Appalachian periodically inspects its transmission system and replaces poles deteriorated in normal usage. From this experience, Appalachian can determine the average useful life of poles in the system. Since in the normal course of doing business Appalachian must bear the expense of replacement costs at some reasonably ascertainable future time, recovery from a tortfeasor of full replacement costs at an earlier time would overcompensate the injury sustained. Thus, if a pole deteriorated in normal usage was to be replaced and an automobile damaged it an hour before the replacement crew arrived with a new pole, Appalachian would gain a windfall if the tortfeasor is required to pay the full replacement costs Appalachian was about to expend. On the other hand, if an automobile damaged a pole an hour after it had been replaced in the normal course of replacement, Appalachian would be less than whole if the tortfeasor is permitted to pay less than full replacement costs.

In each case, the actual injury sustained by Appalachian is related to the useful life of the pole. In the former case, Appalachian would have enjoyed the full anticipated use of its property and incurred no unanticipated expense. In the latter case, Appalachian would have been deprived of the full anticipated use of its property and would have incurred an expense which, but for the tort, would have been deferred for the useful life of the pole.

We are unpersuaded by defendants' argument that "overhead expenses" are part of the on-going expense of doing business and should not be included as part of the costs of replacing a particular pole. The evidence was that automobiles damage an average of one pole a day. If the transmission system is to function, these poles must be replaced promptly. If Appalachian employed an independent contractor to replace these poles, overhead expenses attributable to workers performing the job would be included with the wage cost in the bill paid the independent contractor. Appalachian chooses to employ its own replacement crews. Some of these workmen Appalachian would not be obliged to employ but for predictable tortious damage, and the overhead expenses attributable to them are as much "the natural and proximate result of the wrongful act complained of" as the wages paid them.

We decline to adopt any of the formulae applied in other jurisdictions. We hold that in cases such as these the most equitable and functional formula for calculating compensatory damages is to:

(1) determine the average useful life of poles in the transmission system at large;

(2) determine the present cost of replacement of the damaged pole and material, including the cost of the new pole and material, the cost of wages of labor employed in replacement, the cost of company-financed fringe benefits related to such labor, the cost of transportation related to replacement, and the supervisory and engineering costs related to replacement;

(3) determine the original cost of installation of the old pole and material, including the cost of the old pole and material, the cost of wages of labor employed in installation, the cost of company-financed fringe benefits related to such labor, the cost of transportation related to installation, and the supervisory and engineering costs related to installation; and

(4) deduct from the present cost of replacement the salvage value, if any, of the damaged pole and material, and a "used life credit" which bears the same ratio to the original cost of installation of the

old pole and material as the number of years the old pole has been used bears to the number of years of the average useful life of poles in the transmission system at large.

Appalachian's own practice in computing relocation damage claims against the Commonwealth and the practice of two other power companies of computing tortious damage claims filed with automobile insurance companies support our belief that the damage formula we adopt more accurately compensates the actual injury sustained.

The judgments are reversed and the cases remanded for such further proceedings as computation of damages in accordance with this opinion may require.

*Reversed and remanded.*