## CIRCUIT COURT OF LOUDOUN COUNTY

Wetlands America
Trust, Inc.

v.

White Cloud Nine
Ventures, L.P.

June 19, 2014

Case No. (Civil) 78462

By Judge Burke F. McCahill

This matter came before the Court on the plaintiff's Complaint and the defendant's Counterclaim. The Court heard testimony and argument in this matter on April 7, 8, 9, 29, and 30. At the conclusion of the plaintiff's case-in-chief, the defendant moved to strike the plaintiff's case, which the Court denied. The defendant then introduced evidence, after which the plaintiff put on its case in rebuttal. The defendant did not renew its motion to strike at the conclusion of the trial. The Court took this matter under advisement and now finds as follows.

### Background

Plaintiff Wetlands America Trust, Inc. (WAT) is a nonprofit organization that provides fiduciary support for the endowment and land holdings of Ducks Unlimited (DU), a wetlands and waterfowl conservation organization. Defendant White Cloud Nine Ventures, L.P. (White Cloud) is the owner of Lot 1 Caeli Farms, located in Middleburg, Virginia. Chrysalis Vineyards, L.L.C. (Chrysalis) leases the Caeli property from White Cloud. Jennifer McCloud is both the General Partner of White Cloud and the Managing and only Member of Chrysalis.

WAT holds a conservation easement on the Caeli property pursuant to a Deed of Gift of Conservation Easement granted from Caeli Farms, L.L.C. (Caeli Farms) to WAT on July 9, 2001. This easement covers the 406.87 acre property owned by Caeli Farms. Caeli Farms subdivided this 406.87 acre property into two lots of approximate equal size. Caeli Farms conveyed Lot 2, the easterly lot fronting New Mountain Road, to Brothers Farm, L.L.C. (Brothers Farm) in January 2006. Caeli Farms and Brothers Farm subsequently jointly recorded a Covenant Between Landowners' confirming Brother Farm's ability to construct certain dwellings on the property and providing that, "[i]f the New Mountain Road parcel is subdivided off, there may also be one (1) single family dwelling and guest house on it." WAT was not a party to this agreement. In February 2008, White Cloud purchased Lot 1, the western lot. Lot 1, owned by White Cloud, is subject to the Conservation Easement that is in issue in this case.

Lot 1 borders another property owned by White Cloud, which is currently operated as Chrysalis Vineyards. Ms. McCloud bought Lot 1 with the intent of expanding her vineyard and opening a creamery and bakery to be housed in a farm building with a tasting room. This lawsuit concerns White Cloud's alleged violations under the Conservation Easement with respect to Ms. McCloud's intended use of Lot 1 and her construction of roads, a bridge, and a building to realize those intentions. WAT has set forth fourteen alleged violations of the Conservation Easement in its opposition to White Cloud's trial memorandum. Each of these fourteen alleged violations will be set forth below. White Cloud denies that it has violated the terms of the Easement and has raised various defenses. In its counterclaim, White Cloud asks that the Court declare the Conservation Easement unenforceable or, alternatively, enjoin WAT from prohibiting White Cloud from using Lot 1 for agricultural uses consistent with the Loudoun County Zoning Ordinance and the Virginia Code or enjoin WAT from enforcing certain sections of the Conservation Easement.

## Discussion

In construing written instruments, courts must follow the "plain meaning" rule. *Waynesboro Village, L.L.C. v. BMC Props.*, 255 Va. 75, 79, 496 S.E.2d 64 (1998). In *Waynesboro Village*, the Virginia Supreme Court observed that "[w]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself . . . . This is so because the writing is the repository of the final agreement of the parties." *Id.* at 79-80 (quotations omitted). The Court went on to observe that "the word 'ambiguity' is defined as 'the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time'." *Id.* at 80 (quotations omitted). An agreement is not ambiguous "simply because the parties to the contract disagree about the meaning of

its language." *Pocahontas Mining, L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173, 556 S.E.2d 769 (2002) (citation omitted). Instead, it must be objectively reasonable to understand the contractual language "in more than one way" or to conclude that it "refers to two or more things at once." *Id.* (citations omitted). "When determining a contract's plain meaning, the words used are given their usual, ordinary, and popular meaning." *Id.* (citation omitted).

In the case of *Dart Drug Corp. v. Nicholakos*, the Virginia Supreme Court found that:

> Ordinarily, when ambiguous contractual provisions are at issue, extrinsic evidence is available to discern the intention of the parties. Here, however, we have no such extrinsic evidence. We must, therefore, divine the parties' intention from the provisions of the lease, however ambiguous they may be, aided by any practical construction the parties themselves may have placed upon the provisions in dealings subsequent to the lease's execution ....
>
> Although contractual provisions may be ambiguous and one of the parties to the agreement may be subject to a rule of strict construction, the interpretation adopted by the court must be reasonable and just.

*Dart Drug Corp.*, 221 Va. 989, 993-94, 277 S.E.2d 155 (1981). In *Dart Drug Corp.*, the Court further recognized that, "[w]hen the terms of an agreement are doubtful or uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed if that may be done without violating applicable legal principles." *Id.* at 995 (authority omitted).

In this case, there was extrinsic evidence introduced. The testimony of the original grantor, Theodore Sedgwick, was offered in WAT's case in rebuttal without objection. WAT introduced the testimony of Ambassador Sedgwick, yet WAT has maintained throughout this case that the Conservation Easement is unambiguous. White Cloud maintains that the term "farm building" is unambiguous but does maintain that many provisions are vague and unenforceable. Nonetheless, if the Court finds certain provisions of the Easement ambiguous, the Court may look to this testimony.

Ambassador Sedgwick testified that his "understanding of agricultural pursuits was growing crops and associated activities," "such as building a shed or a barn." Sedgwick Deposition, page 56. He testified that it was not his intent to prohibit any buildings on Lot 1, "just to prevent buildings on highly erodible areas." *Id.* at 60. He acknowledged, with respect to the restriction of no building on highly erodible areas, that it was his recollection that this

"was fairly standard language in these types of easements." *Id.* Ambassador Sedgwick also acknowledged that the purpose in the recorded Easement included "agricultural pursuits," though the initial draft provided to the Loudoun County Department of Planning did not include this purpose. *Id.* at 79-80. He went on to state that "I think in general terms Ducks Unlimited wanted something a bit more restrictive than what I wanted." *Id.* at 74. Ambassador Sedgwick recognized that the property was not to be "only a wildlife sanctuary for the whole property" and that he intended for the property "to be a mix of agricultural as well as wetlands mitigation." *Id.* at 81, 100. Ambassador Sedgwick additionally stated, with respect to whether commercial agricultural uses are permitted, that:

> It depends on how you define "agricultural." If you define agricultural as including a winery, that is subject to interpretation I think. If you define agricultural as growing grapes, I think that is probably an easier call. But agricultural, silvicultural, viticultural, equine to me is more crop growing and certainly would include grape growing and that kind of thing, but, as to whether it would be a winery would be included, clearly in the last sentence it says no commercial, recreational use should be allowed, which gives you a flavor of what they are looking at. They are not interested in having large numbers of people coming. But this, again, on this aspect of it, I really encouraged her to talk to the Wetlands America Trust people so it is not for me to interpret it.[3]

*Id.* at 97.

Although Ambassador Sedgwick admitted to telling Ms. McCloud at one point prior to the purchase that Lot 1 would be a good fit for her, he made it clear that he encouraged Ms. McCloud to speak with WAT with respect to whether her proposed uses were allowed under the Easement. *Id.* at 82-83. With respect to the number of buildings on the property, Ambassador Sedgwick testified that it was his intent "to allow an equal number of buildings on each side of" the road that divides the two properties. *Id.* at 91. With respect to the parking lot, he testified that the parking lot built by White Cloud was not what he had in mind when he granted the easement. *Id.* at 63-64.

The Court, while finding the testimony of Ambassador Sedgwick of some importance, finds that this evidence does not resolve all of the parties' differences. The Court, therefore, believes that, as in *Dart Drug Corp.*, the practical construction placed on the provisions by the parties is very important in this case.

---

[3] This is a reference to conversations between Ambassador Sedgwick and Jennifer McCloud, the owner of White Cloud.

It is also important to recognize that, under Virginia case law, restrictive covenants are not favored. In *Waynesboro Village*, quoting the case of *Friedberg v. Riverpoint Building Committee*, the Virginia Supreme Court set forth the law as follows:

> Valid covenants restricting the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains. Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property.
>
> But if it is apparent from a reading of the whole instrument that the restrictions carry a certain meaning by definite and necessary implication, then the thing denied may be said to be clearly forbidden, as if the language used had been in positive terms of express inhibition.

*Waynesboro*, 255 Va. at 80 (*quoting Friedberg*, 218 Va. 659, 665, 239 S.E.2d 106 (1977) (internal authorities omitted)). Of particular interest to this case, the Virginia Supreme Court has decided separate cases involving the terms "residential building" and "residential purpose."

In *Jernigan v. Capps*, the Court determined "whether the erection of [a] building, designed to house four families, violate[d] the covenants or restrictions that `only one residential building . . . shall be erected on any lot,' or that `the use of the land shall be restricted to residential purposes'." *Jernigan*, 187 Va. 73, 77, 45 S.E.2d 886 (1948). The Court noted that:

> It is an elementary rule of construction that the purpose or intent of a written instrument must be determined from the language used in the light of the circumstances under which it was written. In the case now before us, the restrictions do not in express terms forbid the erection of "an apartment house" or "a multiple family residence." Nor do they limit the type of a permitted building to "a single family dwelling," "a single family residence," "a single family house," "a single detached dwelling." None of these or other expressions of like clear import are used.

*Id*. at 79. With respect to determining whether the proposed structure was "a residential building," the Court observed that:

> It is not necessary that we go to a dictionary or a law book to ascertain the meaning of "a residential building." Giving the

words their plain and ordinary meaning, we would say that such a building is one which is used for residential purposes, that is, one in which people reside or dwell, or in which they make their homes, as distinguished from one which is used for commercial.

But if the obvious must be supported by authority or judicial precedent, we find that they are of the same view.

*Id.* at 80.

More recently, in *Scott v. Walker,* the Court determined "whether a restrictive covenant stating that certain real property `shall [not] be used except for residential purposes prohibit[ed] the short-term rental of a single-family dwelling." *Scott,* 274 Va. 209, 211, 645 S.E.2d 278 (2007). The Court found:

the restrictive covenant, in particular the phrase "residential purposes," to be ambiguous in several respects. It is ambiguous as to whether a residential purpose is viewed only in contradistinction to a business or commercial use; and, if not so limited, it is ambiguous both as to whether a residential purpose requires an intention to be physically present in a home for more than a transient stay and as to whether the focus of the inquiry is on the owner's use of the property or the renter's use. Indeed, even the circuit court's interpretation that the term " `[r]esidence' means more than mere physical presence and less than domicile" is ambiguous. It can be argued that a nightly or weekly rental is more than mere physical presence. Moreover, if the phrase "residential purposes" carries with it a "duration of use" component, it is ambiguous as to when a rental of the property moves from short-term to long-term.

Under our case law, a restrictive covenant of "substantial doubt or ambiguity" must be interpreted "in favor of the free use of property and against restrictions." If the restrictive covenant at issue was intended to prevent the short-term rental of lots in the Harbor Village Subdivision, "it would have been easy to say so, and it would not likely have been left to the uncertainty of inference." In the absence of language expressly or by necessary implication prohibiting nightly or weekly rentals, we find that the Scotts' short-term rental of their property did not run afoul of the restrictive covenant at issue. The Walkers did not carry their burden to establish that

the terms of the restrictive covenant prohibited the activity to which they objected.

*Id.* at 217-18 (internal authorities omitted).

The recent Virginia Supreme Court case of *CNX Gas Co., L.L.C. v. Rasnake*, which addressed an ambiguity in a deed, is also noteworthy. In that case, the Court stated that, "[w]here the language of a deed clearly and unambiguously expresses the intention of the parties, no rules of construction should be used to defeat that intention. Where, however, the language is obscure and doubtful, it is frequently helpful to consider the surrounding circumstances and probable motives of the parties." *CNX Gas Co., L.L.C.*, 287 Va. 163, 166-67, 752 S.E.2d 865 (2014) (citations omitted). Finding that the disputed language was capable of being understood in more than one way, the Court went on to say:

> We are also aided by several well-established rules of construction. Where language in a deed is ambiguous, the language must be construed against the grantor and in favor of the grantee. We have called this rule "one of the most just and sound principles of the law because the grantor selects his own language." A grantor must be considered to have intended to convey all that the language he has employed is capable of passing to his grantee.
>
> Other rules of construction also apply when language in a deed is found to be ambiguous. The whole of a deed and all its parts should be considered together. Effect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or meaningless. Where the meaning of the language is not clear, or the deed is not artfully drawn, the court should interpret its terms to harmonize them, if possible, so as to give effect to the intent of the parties.

*Id.* at 167-68 (internal authorities omitted).

With respect to repugnancy, the Virginia Supreme Court stated, in *Conner v. Hendrix*, that:

> It is a well-settled rule of construction that, inasmuch as the parties must have intended all the provisions and terms of a deed to have some meaning and be given some import from the fact that the terms and provisions were actually inserted in the deed, a deed will be so interpreted as to make it operative and effective in all its provisions, if its terms are susceptible of such interpretation. Every word, if possible, is to have effect, for, it has been said, the deed, as the witness to the contract

between the parties, should speak the truth, the whole truth, and nothing but the truth." 16 Am. Jur., *Deeds*, § 171, page 534. *Realty Securities, etc., Co. v. National Rubber, etc., Co.*, 122 W. Va. 21, 7 S.E.2d 49, 51. . . .

The proper rule to be applied here is that stated by Buchanan, J., in *State Sav. Bank v. Stewart*, 93 Va. 447, 451, 25 S.E. 543, 544:

> "Where several particulars are given in the description, all of which are necessary to identify the land intended to be conveyed, nothing but what will correspond with all the particulars will pass by the deed; but where the deed contains two descriptions of the land equally explicit, but repugnant to each other, that description which the whole deed shows best expresses the intention of the parties must prevail." *Mathews v. Gillespie*, 137 Va. 639, 647, 120 S.E. 324.

*Conner*, 194 Va. 17, 25-26, 72 S.E.2d 259 (1952).

In this matter, the interpretation of several provisions of the Conservation Easement has been called into question. The Court will address these provisions in the various sections below. In doing so, it is important to recognize that the Conservation Easement is drafted in such a fashion that has led to controversy as to its plain meaning. This has led, as one of the witnesses put it, to the "convoluted mess" that has resulted. Christman Deposition, page 182. In attempting to wade through the claimed violations, the Court believes it best to take each of the fourteen alleged violations in turn.

In doing so, it is important to keep in mind the purpose of the Conservation Easement and the role that the Baseline Documentation Report serves in determining whether a violation has occurred. Section 1.1 of the Conservation Easement provides:

> It is the purpose of this Easement to assure that the Protected Property will be retained *in perpetuity* predominantly in its natural, scenic, and open condition, as evidenced by the Report, for conservation purposes as well as permitted agricultural pursuits, and to prevent any use of the Protected Property which will impair significantly or interfere with the conservation values of the Protected Property, its wildlife habitat, natural resources or associated ecosystem ("Purpose").

The "Whereas" clause on page 5 of the Conservation Easement provides:

> Whereas, the specific conservation values of the Protected Property on the date of this Easement are documented in

the Baseline Documentation Report ("Report"), dated May 2001, a copy of which is on file with both the Grantor and the Grantee. Both parties agree the Report provides an accurate representation of the Protected Property and the condition of the same as of the date of this Easement as required by Treasury Reg. 1.170A-14(g)(5), and is intended to serve as an objective informational baseline for monitoring compliance with the terms of this Easement.

These provisions of law, the purposes specified, the Baseline Documentation Report, and the specific provisions identified set forth the backdrop pursuant to which the Court must evaluate the claims below. Even though the purpose of this Easement as outlined above must be recognized, it is equally important to keep in mind that the Easement does allow permitted agricultural "pursuits," agricultural "activities," and industrial or commercial agricultural activities, as well as other uses and activities. Permitted buildings, structures, utilities, and roads are allowed.

### 1. Section 3.3(A)(iv): The Building Is Not a "Farm Building"

This first item, with respect to whether the building placed on White Cloud's property is to be considered a "farm building" under the Conservation Easement, is a linchpin in this case and affects much of the analysis to follow.

The preamble to Section 3.3 and the relevant part of Section 3.3(A) of the Conservation Easement provides:

> There shall be no construction or placement of transmission or receiving towers, energy facilities, water tanks, permanent mobile homes, or manufactured housing on the Protected Property. All structures shall be designed and located taking into consideration the conservation values of the Protected Property. The following limitations on structures are hereby agreed to by the Grantor:

> A. No permanent or temporary building or structure shall be built or maintained on the entirety of the Protected Property other than . . . farm buildings or structures.

3.3(A)(iv).

The term "farm building" is not defined by the Conservation Easement, nor is the term "farm structures." This is one of the primary disputes between the parties.

Ms. McCloud has built what she has called a farm building on the Caeli property. This building is to be used as a tasting room, creamery, and bakery. It is Ms. McCloud's intent to grow grapes on this property and turn those

grapes, along with grapes grown on her other property, Chrysalis, and imported from other farms, into wine, which will be aged in barrels in the farm building. Ms. McCloud also has dairy cows that graze on the Caeli property that she intends to milk at a parlor built on her other adjoining property. This milk will be processed into cheese in the farm building. Ms. McCloud additionally plans to grow wheat on the Caeli property, which will be processed into bread in the farm building. The farm building will include a tasting room for these products, along with a retail component for the sale of these products. The retail component may include souvenirs and goods not produced on the farm, as is currently the practice at Chrysalis. The farm building may also host events, such as music festivals and weddings, which have been hosted at Chrysalis in the past.

WAT contends that Ms. McCloud's proposed use of the building does not comport with that of a farm building. WAT contends that the plain meaning of "farm building" is a building related to the growing of crops or raising of animals. In support of this contention, WAT cites the *Jernigan* case, in which the Virginia Supreme Court found the term "residential building" to be unambiguous. WAT asserts that, because the term "farm building" is likewise unambiguous, the Court need not consult outside sources to help define this term or consider parol evidence. Because Ms. McCloud will be importing grapes and milking her cows off of the Caeli property, WAT asserts that the building is not related to the growing of grapes or raising of animals on her property. They contend that the scope of activities Ms. McCloud intends to use the building for are beyond the scope of a farm building. WAT also points out that the Conservation Easement does not incorporate the Virginia Code in defining the term "farm building." See discussion of Va. Code § 36-97, *infra*.

White Cloud contends that the plain meaning of farm building includes the uses Ms. McCloud intends for the building. White Cloud takes the position that any building on a farm would qualify as a farm building. White Cloud points to the *Webster's Ninth New Collegiate Dictionary* definition of agriculture, which provides that agriculture is "[t]he science or art of cultivating the soil, producing crops and raising livestock and, in varying degrees, the preparation of these products for man's use and their disposal (as by marketing)." White Cloud also points to the definitions of "horticulture" and "farm winery" in the Loudoun County Zoning Ordinance and Virginia Code respectively, along with the definition of "farm building" found in the Virginia Code. With respect to the latter, the Code provides, in relevant part, that:

> "Farm building or structure" means a building or structure not used for residential purposes, located on property where farming operations take place, and used primarily for any of the following uses or combination thereof:

1. Storage, handling, production, display, sampling, or sale of agricultural, horticultural, floricultural, or silvicultural products produced in the farm.

Va. Code Ann. § 36-97.

At the time she was planning to acquire the property, Ms. McCloud made the sellers aware of her vision to grow Norton grapes, graze cows, make cheese, and provide access to the public. White Cloud's Exhibit # 17. She even discussed a tasting room and restaurant. White Cloud's Exhibit # 15. She appeared to rely in part on language found in the Loudoun County Zoning Ordinance and Code of Virginia. She acknowledged that the seller expressed concerns over the retail aspects of her plan but she felt that the Easement allowed it. White Cloud's Exhibit # 16. David Marone, an attorney for DU, advised the seller that winery/vineyard buildings would be permitted buildings but permitted agriculture would not allow stores, inns, or a restaurant. White Cloud's Exhibit # 16. He acknowledged an expanding definition of agriculture but emphasized that a use that is permitted under a zoning ordinance is not necessarily permitted under the Easement. White Cloud's Exhibit # 16.

Following conversations with Mr. Marone, Ms. McCloud did not feel there would be an issue with her plans. White Cloud's Exhibit # 18. Perry Griffin, Ms. McCloud's business partner, was in contact with a DU biologist, Mike Budd, who also did not see any significant problems with her building plans. White Cloud's Exhibit # 23.

Following settlement, Ms. McCloud continued to interact with a number of representatives of DU. The organization would conduct annual inspections (monitoring) of the property to determine compliance with the Easement. On occasion, Ms. McCloud would be present. A report was generated from these inspections.

By the fall of 2010, Piedmont Environmental Council (PEC), an environmental organization in the area, became aware of White Cloud's plans from Ms. McCloud's newsletter with Chrysalis and raised concerns. White Cloud's Exhibit # 37. Thereafter, PEC became increasingly involved in raising concerns, and DU would respond to PEC with information, often after inquiring of Ms. McCloud.

During the monitoring of the property, the road that was being constructed would be observed. By January 5, 2011, the road had been built up to the Little River but the bridge had not been constructed. Jenifer Christman stated in an email to PEC that the roads were being constructed in compliance with the Easement. White Cloud's Exhibit # 45. See also White Cloud's Exhibit # 57 (April 28, 2011, monitoring report).

Although the parties never reached a final agreement, prior to the litigation, they began to negotiate changes to the Easement in order to clarify certain provisions. Both sides seemed to acknowledge the need to

make changes. White Cloud introduced a series of documents that included comments by the parties regarding the changes. WAT's Exhibits # 52, # 55, and # 56. This evidence demonstrates that the parties were uncertain as to the meaning of certain provisions and wanted to amend certain provisions. Section 3.2, relating to subdivision, received considerable attention, reflecting uncertainty as to its meaning regarding the ability to erect buildings on each parcel after subdivision. See also White Cloud's Exhibit # 59. The original tract had already been subdivided at that time, and the parties attempted to agree on language that would address this specific issue including the type of building that would be permitted. Many of the exchanges between the parties included discussion of the need to clarify the very issues that are the subject of this litigation. See White Cloud's Exhibit # 56. From these exchanges it is clear that, although they disagreed on the issue of a primary dwelling and secondary dwelling on her subdivision, the parties agreed that White Cloud would be able to erect a structure and specifically a farm building on White Cloud's property. As it turns out, the issue of White Cloud's ability to erect a primary and secondary dwelling is not the issue in this case. The issue in this case is her ability to erect a farm building.

The Court also observes that Jamie Brown, an attorney with DU serving as the Director of Land Protection, changed his position since the suit was filed as to whether Ms. McCloud can build farm buildings on the property. Mr. Brown admitted during his deposition that he agreed that a milking parlor and creamery would fall under agriculture. Brown Deposition, page 109. Mr. Brown also admitted that on multiple occasions he confirmed that buildings and structures could be built on the property. *Id.* at 111. Mr. Brown stated that it was not until after the filing of the lawsuit when outside counsel looked at the case that he changed his position and now concludes that the restriction in Section 3.3(C)(ii), requiring that no building be constructed more than 400 feet from New Mountain Road, applies to this property. *Id.* at 110. This claimed violation is discussed in item 3. During his deposition, Mr. Brown also admitted that both commercial and industrial agriculture are permitted under the Easement. *Id.* at 155. He further admitted that "[t]here were some areas [of the Easement] that needed clarification, some areas needed change" and that "[s]ome of the areas may have been ambiguous, but really it was just to make sure both parties understood it." *Id.* at 173. Mr. Brown went on to admit that "it was not clear what one farm building was, to one person it could be a different farm building than to another person." *Id.* at 184-85. He also agreed that there was no limit on the number of farm buildings that could be built on White Cloud's property and admitted that it was not until the complaint was filed that he ever considered the number of buildings that could be on the property to be zero. *Id.* at 187.

The deposition of Jenifer Christman, the Manager of Conservation Programs, Lands, for DU, was also introduced into evidence. Ms. Christman agreed in 2009 that Ms. McCloud could build a milking parlor or creamery

on the property as a farm building. Christman Deposition, page 77. Although Ms. Christman engaged in discussions with Ms. McCloud to clarify what types of buildings were permitted, Ms. Christman did not believe that Ms. McCloud was precluded from placing a building on her property. *Id.* at 136, 145. During her deposition, Ms. Christman also admitted that "the term agricultural pursuits is somewhat subjective." *Id.* at 153.

The Court previously, during a motion prior to trial, found that the Conservation Easement was not ambiguous. The Court believes, however, that it must revisit this ruling. The Conservation Easement did not incorporate the definition of "farm building" provided for in the Virginia Code; however, this definition illustrates that the term may have a more expansive definition from that offered by WAT. Such conclusion is also supported by the definitions of "farm" found in the *Webster's Encyclopedic Unabridged Dictionary of the English Language*, which includes definitions that a farm is "a similar, usually commercial, site where a product is manufactured or cultivated: *a cheese farm; a honey farm*" and that a farm is "a tract of land on which an industrial function is carried out, as the drilling or storage of oil or the generation of electricity by solar power." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 699 (2001). The same dictionary defines "manufacture" as "the making of goods or wares by manual labor or by machinery" and "the making or producing of anything." *Id.* at 1172. This suggests that processing of component farm products into a finished product is a concept encompassed within the term farming.

The term "agriculture" further serves to shape what are allowable uses of the farm building. Section 1.1 of the Easement includes as the purpose of the Easement "permitted agricultural pursuits," and Section 3.10 elaborates on the permitted agricultural activities allowed on the property. Section 3.10 provides, in relevant part, that:

> Permitted agricultural activities include but are not limited to: farming, horticulture, viticulture, including nursery, aquaculture, animal husbandry, and cattle and livestock activities, provided the same are conducted in a manner consistent with the Purpose of this Easement . . . . Permitted agricultural activity must be consistent with the maintenance and enhancement of soil composition, structure, and productivity, and may not result in significant degradation of any waters or have a significant effect upon fish or wildlife, their natural habitat, or upon the natural ecosystem and its process.

Section 3.1, which is entitled "uses," requires careful reading and is critical to many of the issues in the case. Section 3.1 provides that:

Industrial or commercial activities other than the following are prohibited: (i) agriculture, silviculture, viticulture, horticulture, and equine activities, (ii) temporary or seasonal outdoor activities which do not permanently alter the physical appearance of the Protected Property, and which are consistent with the conservation values herein protected, (iii) activities which can be and in fact are conducted within permitted buildings without material alteration to the external appearance thereof. Temporary activities involving one hundred (100) people or more shall not exceed seven (7) days in duration without prior approval of the Grantee. Notwithstanding any other provision of this Easement, no commercial recreational use (except for *de minimis* commercial recreational uses) shall be allowed on the Protected Property.

As worded, the first phrase attempts to prohibit activities that are industrial or commercial other than those listed in (i): agriculture, silviculture, viticulture, horticulture, and equine activities. This leads to the conclusion that there are forms of agriculture that are industrial or commercial but more importantly that are not prohibited under the Easement. The section then identifies activities in (ii) and (iii). As worded, these appear to be activities that are permitted, not prohibited. Therefore, it appears that the first phrase of Section 3.1 only modifies (i) and not (ii) and (iii). However, the last sentence then does contain an important restriction. It prohibits commercial recreational uses except *de minimis* commercial recreational uses. No definition of commercial recreational use or *de minimis* is given. Therefore, the uses set forth in (i), (ii), and (iii) must not be commercial recreational uses unless *de minimis*. It does not appear that the uses under (ii) and (iii) must necessarily be, for example, agricultural in nature. It is the task of the Court to try to reconcile the right of White Cloud to engage in commercial agricultural activities permitted under (i) that do not run afoul of the limitations that prevent commercial recreational use unless *de minimis*. There is no percentage or criteria provided in the Easement for how the Court is to balance commercial agriculture versus commercial recreational uses.

It appears that both parties acknowledge that Section 3.1 allows for industrial or commercial agricultural and viticulture activities. *Webster's Encyclopedic Unabridged Dictionary of the English Language* defines "commercial" as "prepared, done, or acting with sole or chief emphasis on salability, profit, or success, "suitable or fit for a wide, popular market," and "suitable for or catering to business rather than private use." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 411 (2001). The same dictionary defines "agriculture" as "the science, art, or occupation concerned with cultivating land, raising crops, and feeding, breeding, and raising livestock; farming" and the "production of crops, livestock, or

poultry." *Id.* at 41. The Conservation Easement recognizes in Section 4.1 that "changes in agricultural technologies, including accepted farm and forest management practices may result in an evolution of agricultural activities on the Protected Property." White Cloud maintains that its proposed uses are consistent with the current trend in Loudoun County that has recognized and encouraged vineyards in an effort to preserve open space.

When giving meaning to the terms of the Easement, the Court also must look to other provisions in the Easement. Section 3:19, entitled "Use Inconsistent with Purpose," provides in relevant part that:

> The parties recognize that this Easement cannot address every circumstance that may arise in the future. The parties agree upon the Purpose of this Easement as set forth in Section 1.1: to retain the Protected Property *in perpetuity* predominantly in its natural, scenic, and open condition as evidenced by the Report, for conservation purposes as well as permitted agricultural pursuits to prevent any use of the Protected Property which will impair significantly or interfere with the conservation values of the Protected Property, its wildlife habitat, natural resources, or associated ecosystems. *The Grantor has the right to engage in any and all acts or uses not expressly prohibited herein that are not inconsistent with the Purpose of this Easement.* Any use not reserved in Section III which is inconsistent with the Purpose of this Easement or which materially threaten the Purpose of this Easement is prohibited.

(Emphasis added.)

Sections 3.3(B) and (C) are also of note. Section 3.3(B) limits the types of permitted buildings and private roads and utilities serving them allowed on the property, and Section 3.3(C) further limits the placement of buildings and structures on the property. In giving meaning to the term "farm building," the Court must reconcile these various provisions of the Easement.

The Court recognizes that the Virginia Supreme Court found the term "residential building" unambiguous in the *Jernigan* case; however, in the more recent case of *Scott v. Walker*, the Virginia Supreme Court found the phrase "residential purposes" to be ambiguous. In that case, the Court noted that, to the extent there was a "duration of use" component, it was "ambiguous as to when a rental of the property moves from short-term to long-term." *Scott*, 274 Va. at 218. Likewise, here, because the Conservation Easement does not define the term "farm building," it is unclear when the scope and scale of the use of the building moves from that which is a permissible use to that which is not.

Although there are generalized statements in the Baseline Documentation Report and in the Conservation Easement regarding the condition and preservation of the property, the real focus in this case is on the permitted uses because it is clear, and the parties agree, that the property is not to be maintained as a sanctuary. It is also clear that these permitted uses would evolve and, of necessity, involve disturbances on the land. Moreover, because certain structures are permitted under the Easement, it is obvious that it was contemplated that there would be disturbances to the land. For example, Section 3.4 allows for the placement of septic and other utility systems on the property, and Section 3.5 of the Easement permits the construction of roads on the property.

Much of the dispute in this case is based on the scope and scale of what Ms. McCloud intends to do. The parties could have imposed specific limitations and provided precise definitions or scale and scope limitations that could be objectively measured. Although the Easement has some specific requirements and benchmarks, many provisions do not. The overriding requirement is that the uses not "impair significantly" the conservation values of the property. To apply this in the context of a permanent easement is subjective and challenging. Unfortunately, with only a few exceptions, there is no definition of the scope and scale of permitted uses in the Easement, and the Court is left to decide if the Easement is significantly impaired. Except for the limit of 4500 square feet in ground area discussed later, there is no limitation on height, the number of levels, doors, windows, construction material, and the use of HVAC. This could result in a small wooden structure with a dirt floor or a more elaborate building that has utilities, plumbing, and HVAC. The Easement also does not specify what percentage of the building must be devoted to a farm use nor does it define what is a farm use. It does not expressly prohibit the processing of items or the rétail sale of items. It does not, for example, specify whether legitimate farm products or farm equipment from another farm is prohibited from utilizing the building. Moreover, there is no prohibition against products from another farm from being stored in a permitted building. Obviously, an individual engaged in agriculture may store grain, seed, hay, fertilizer, and other items grown or processed elsewhere as a part of the operation. Tractors, tools, parts, equipment, and fuels that are manufactured elsewhere are likely to be stored there as well. This Easement has no limit on the number of trips that can be made by farm workers on their equipment or on the number or size of the equipment used. There is also no limit on the days of the week or the hours per day that the structure can be utilized. Likewise, the Easement is silent as to how many visitors and cars may come to a farm building for a permitted purpose. The parties could have established these limits, but they did not. For this reason, the Court rejects the notion advanced by WAT that, if a component part is imported to the property, then the use can only be considered a form of manufacturing.

The Easement recognizes in Section 4.1 that agricultural activities evolve and allows, in Section 3:19, for the Grantor to engage in uses not expressly prohibited. Although Ms. McCloud's intended uses of the farm building may not be limited to traditional notions of agriculture, the Easement allows for evolving agricultural uses. For example, the tasting of wine is akin to the sampling of fruit from a roadside fruit stand. Though the scale of Ms. McCloud's operation may be larger than that of a roadside fruit stand, the Easement does not limit the scale allowed. The Easement also does not prohibit the onsite consumption of the products sampled and purchased, nor does it limit the amount of time that visitors may spend on the property.

In consideration of all of the above and because the Easement does not clearly define and restrict the uses associated with a farm building, the Court finds that the term "farm building" is capable of being understood in more than one way and is therefore ambiguous. As noted in *Scott*, when there is an ambiguity in a restrictive covenant, the covenant must be "interpreted in favor of the free use of property and against restrictions." *Id*. (internal quotation omitted). The parties to the Conservation Easement could have chosen to define the term "farm building." Having failed to do so, the Court believes that it is not to be interpreted in the restrictive fashion argued by WAT. The Court, however, does not believe that any building on a farm would qualify as a farm building, as White Cloud has argued. This could lead to an absurd and unintended result. For example, White Cloud could claim that a gas station on the farm would qualify as a farm building because it is literally a building on the farm. The Court finds that there must be a nexus between the use of the farm building and the farming and agricultural activities taking place on the property. It would not include a dwelling. As noted above, this case largely presents issues of scale and scope with respect to the uses of the farm building. The Court recognizes that the scale and scope of the uses could change in the future. The Court's ruling is made in consideration of the evidence presented to it at the trial. Based on that evidence, the Court finds that Ms. McCloud may use the building to process and age wine, to process and age cheese, and to produce bread. She may also use the building for the tasting and sampling of these products.

The Court also recognizes, and the parties do not dispute, that Section 3.1 of the Conservation Easement allows for "[i]ndustrial and commercial activities," including agriculture and viticulture. The focus is not just on agriculture but also the commercial aspect that is allowed. Inherent in the concept of farming and agriculture is the creation of products, which may be sold through commerce. The term "retail" is defined by *Webster's Encyclopedic Unabridged Dictionary of the English Language* as "the sale of goods to ultimate consumers." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1642 (2001). The Court finds that retail is encompassed within the permitted commerce under the Easement.

However, the Court again finds that there must be a nexus between the products being sold and the agriculture taking place on the property. White Cloud suggests that if, for example, selling a t-shirt or a corkscrew brings in customers who will buy other products, it is permitted. The Court finds that, in such case, the nexus is too remote. Such a notion would allow the sale of almost anything and create retail uses unrelated to commercial agriculture. There is an obvious difference between a commercial sale of a product that is agricultural in nature and a product that is not agricultural but designed to encourage other purchases. Therefore, although the Court finds that the building may be used for the sampling and sale of the farm products, such as wine, cheese, and bread, the Court believes that some of Ms. McCloud's other intended uses, such as the sale of goods that do not have a nexus to her property and are not agricultural in nature, are more problematic and go too far. The Court will discuss other potential limitations on the use of the farm building further under items 11 through 14 below.

### 2. Section 3.3(C)(v): The Bridge Is a Structure Impermissibly Built within 200 Feet of a Perennial Stream

Section 3.3(C)(v) of the Conservation Easement provides that "[n]o building or structure of any nature may be constructed or maintained on the Protected Property . . . within two hundred (200) feet of the center line of any perennial stream or pond on the Protected Property."

WAT argues that the bridge, which crosses a perennial stream, is clearly a structure that is prohibited under the Easement. Additionally, WAT presented evidence from its expert, Michael Rolband, a civil engineer and wetland scientist, as shown in WAT's exhibit # 46, that the bridge is on a 100 year floodplain. Section 3.3(C)(vii) of the Easement provides that "[n]o building or structure of any nature may be constructed or maintained on the Protected Property . . . on any 100 year floodplains as identified by the U.S. Geological Survey Floodplain Maps." WAT, however, did not raise this point in its closing argument and, instead, focused on the requirement that no structure be placed within 200 feet of a perennial stream. In its argument, White Cloud noted that the Conservation Easement does not define the term "structure." White Cloud also noted that, under Section 3.5, roads are allowed and that section separately refers to bridges. White Cloud further noted that no one objected to the construction of the bridge until after the filing of this lawsuit and that this is not raised in the Complaint filed.

WAT's exhibit 43, an aerial image, and exhibit 45, a photo, show that the bridge is within 200 feet of a stream. Pursuant to White Cloud's exhibit number 42, it appears that White Cloud did construct the bridge in accordance with the law. See also White Cloud's Exhibits # 76 (grading permit) and # 77 (erosion sediment control plan). The evidence before the Court includes a newsletter from Chrysalis Vineyards mentioning the bridge as being in the plans for the Caeli property. The evidence further

includes the monitoring reports from DU. See, e.g., WAT's Exhibits # 30, # 35, # 45, and # 57. At no point did anyone from DU suggest that Ms. McCloud could not go ahead with the construction of the bridge.

As White Cloud has argued, this issue is not addressed anywhere in WAT's Complaint. The Virginia Supreme Court has observed that:

> A litigant's pleadings are as essential as his proof, and a court may not award particular relief unless it is substantially in accord with the case asserted in those pleadings. Thus, a court is not permitted to enter a decree or judgment order based on facts not alleged or on a right not pleaded and claimed.

*Jenkins v. Bay House Assocs., L.P.*, 266 Va. 39, 43, 581 S.E.2d 510 (2003) (authorities omitted). The Court went on to observe that "every litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense . . . . The issues in a case are made by the pleadings, and not by the testimony of witnesses or other evidence." *Id*. at 43-44 (internal quotation omitted). Because WAT did not contend anywhere in its Complaint that the bridge was in violation of the Conservation Easement, the Court finds that WAT is precluded from raising this argument at trial.

*3. Section 3.3(C)(ii): The Building Is Impermissibly Located More Than 400 Feet from the Centerline of New Mountain Road*

Section 3.3(C)(ii) of the Conservation Easement provides that "[n]o building or structure of any nature may be constructed or maintained on the Protected Property . . . more than four hundred (400) feet from the centerline of State Route 631 (New Mountain Road)."

WAT argues that this provision is unambiguous. WAT's exhibit number 39 shows that the building is greater than 400 feet from New Mountain Road. White Cloud argues that David Marone, counsel for DU, told Ms. McCloud that this provision did not apply to the subdivided parcel. In WAT's exhibit number 19, White Cloud has acknowledged in discovery that the building is located more than (400) feet from the center line of State Route 631 (New Mountain Road). See the discussion of this point in item 1. White Cloud further argues that applying this restriction against the property would create a repugnancy, as this would leave Ms. McCloud unable to place any buildings on the property when the Conservation Easement allows for certain buildings to be placed on the property. Moreover, during the trial, Ms. McCloud testified that she received assurances from the seller and DU that the 400 foot restriction found in Section 3.3(C)(ii) applied to the other subdivided parcel and not Lot 1.

With respect to this issue, the Court must reconcile Sections 3.2 and 3.3(B). In looking at these provisions, the Court finds that it is ambiguous

as to whether this restriction applies to White Cloud's property. The Court finds from the evidence and testimony that the practical construction given by the parties was that Ms. McCloud was not restricted from erecting a farm building by this section. There was conflicting argument about whether Ms. McCloud would be precluded from constructing any buildings on her property, such that there may be a repugnancy when reading the Conservation Easement as a whole. Even taking WAT's position that Ms. McCloud could have technically constructed a building in one far corner of her property, the Court finds that this was not the practical construction placed on this provision by the parties. The evidence is clear that no one ever raised this section as a restriction to Ms. McCloud's use of the property prior to the lawsuit and, instead, affirmed that this section did not apply. Accordingly, the Court finds that the location of the building is not in violation of Section 3.3(C)(ii) of the Conservation Easement.

### 4. Section 3.3(C)(vi): The Building Was Impermissibly Constructed in a Highly Erodible Area

Section 3.3(C)(vi) of the Conservation Easement provides that "[n]o building or structure of any nature may be constructed or maintained on the Protected Property . . . on any highly erodible areas as identified by the U.S. Department of Agriculture, its successor agencies, and/or assigns."

WAT argues that their expert, William Sledgesky, found that the site was highly erodible as defined by the U.S. Department of Agriculture (USDA) in the Code of Federal Regulations. See 7 C.F.R. § 12.21. Mr. Sledgesky based his opinion on an erosion index formula set forth by the USDA, under which anything greater than "8" is highly erodible. He used WAT's exhibit # 51, a map with an outlining of transects, and located transects A-F. White Cloud criticizes this and argues that WAT's expert did not account for the fact that the soil was regraded prior to the construction of the building. White Cloud points out that the Easement refers to "highly erodible areas," yet WAT's expert relied on a definition of "highly erodible lands" and that there is no USDA definition of "areas." White Cloud argues that the definition applies to agriculture, not buildings. WAT's expert himself acknowledged that there is a universal soil loss equation used in land management for crop production. In support of this, White Cloud's expert, Steven White, a soil scientist, observed that the USDA uses an erodibility index. Despite requiring that highly erodible areas be determined as identified by the USDA in Section 3.3(C)(vi) of the Easement, the Easement itself uses the term "highly erodible areas," not "erodible lands." White Cloud's expert, Alex Blackburn, a soil scientist, stated that the maps only are of two acres or more and are not site specific and that almost everything under the National Resource Conservation Service of the USDA is highly erodible. Additionally, Mr. Blackburn went to the site and augered the holes and found that the soil was well-drained and had good structure. White Cloud

argues that, because WAT's expert did not visit the specific site and instead relied on a map, he did not determine its erodibility "as built," whereas White Cloud's expert actually went to the site. White Cloud additionally argues that the Easement allows regrading under Section 3.6.

At closing arguments, it became apparent that there is a disagreement between the parties as to whether the Court must consider the state of the soil prior to be being regraded for the construction of the building or whether this issue is determined after the site is regraded. Section 3.6 of the Conservation Easement provides that "[g]rading, blasting, or earth removal shall not materially alter the topography of the Protected Property except . . . as required in the construction of permitted buildings, as per Section 3.3 and private roads . . . . " Therefore, the Court needs to reconcile this permitted right with Section 3.3(C)(vi).

The Conservation Easement recognizes that the topography may be graded in order to construct permitted buildings. Although Section 3.3(C)(vi) disallows a building to be constructed on highly erodible areas, this language does not prohibit the regrading of the soil prior to construction. White Cloud asserts that the soil was regraded prior to the construction of the building. WAT has not provided any evidence that the soil was highly erodible when the building was actually constructed. WAT's expert never visited the property and his assessment is based solely on a contour map of the land prior to it being flattened for construction. Moreover, although the Easement does reference the USDA, the maps are not site specific. Even assuming that White Cloud is bound by the USDA standard, this may result in no buildings being permitted, which is clearly not contemplated by the Easement. Additionally, any doubt about whether the erodibility is to be determined before or after the site is regraded must be resolved in favor of White Cloud. The Court finds that White Cloud may regrade under Section 3.6 and then test to determine whether the soil is erodible. Here, there is no evidence that the land was highly erodible after it was regraded. Accordingly, the Court finds that the building is not in violation of Section 3.3(C)(vi) of the Conservation Easement.

*5. Section 3.6: The Topography Was Materially Altered in a Manner Not Required in the Construction of a Permitted Building*

Section 3.6 of the Conservation Easement provides:

> Grading, blasting, or earth removal shall not materially alter the topography of the Protected Property except to create private fish ponds or lakes with prior written approval of Grantee or as required in the construction of permitted buildings, as per Section 3.3, and private roads, as per Section 3.5, and utilities, as per Section 3.4, serving them. Generally accepted agricultural activities shall not be considered material

alteration. Best Management Practices, in accordance with the Virginia Erosion and Sediment Control Law, shall be used to control erosion and protect water quality in the construction of permitted private roads. Notwithstanding the foregoing, no grading, blasting, or earth removal shall be permitted on the Protected Property if it will materially diminish or impair the conservation values protected by this Easement. Mining on the Protected Property is prohibited.

WAT raises issues related to the parking lot and the mounds of dirt observed. With respect to the parking lot, WAT argues that the parking lot was not required in the construction of a permitted building and that it materially altered the topography of the property. WAT cites to Section 3.12 of the Conservation Easement, which provides that "[t]he Grantor reserves the right to grade, move earth, and otherwise alter the topography of the Protected Property, with prior written approval of Grantee, which approval shall not unreasonably be withheld for dam construction and the creation of private ponds, lakes, and/or wetland areas. Such activity shall not impair the conservation values or the Purpose of this Easement." White Cloud argues that the regrading was for the purpose of installing the permitted farm building and that they do not need written approval for grading. White Cloud also argues that WAT was aware of the parking area and no one ever told Ms. McCloud that she could not have a parking area.

Section 3.12 deals with water resources. Reading that section as a whole, and in conjunction with Section 3.6, it appears that written permission is only required for the creation of dams, ponds, lakes, or wetland areas, and not for permitted buildings. The question becomes whether the grading of the parking area was required in the construction of a permitted building. Having already found that the building could be used for tastings and sales, it would follow that the patrons of the building would need somewhere to park when visiting the building. Accordingly, the Court finds that the parking lot is not in violation of Section 3.6 of the Easement.

With respect to the mounds of dirt, WAT offered its expert, Michael Rolband, who found that 11,850 cubic yards were "cut" and 16,800 cubic yards were "filled." Mr. Rolband did not calculate the percentage of ground affected. See also WAT's Exhibits # 48, the "cut and filled analysis," and # 69, aerial photos. White Cloud's expert, Mr. Jeffries, disputes the cut and filled analysis as inaccurate and found that no material was imported. Mr. Jeffries argued that the top soil is stripped for roads and saved and used in the final stage of grading. The Court recognizes that the actual building site may be materially altered, but this must be balanced with the impairment to the property as a whole. The Court cannot find that the conservation values protected by the Easement were materially diminished or impaired in this case. The Court finds that temporary mounds of dirt are permitted in the construction of permitted buildings and that, as long as the mounds are

used in the final grading, there is no violation of the Easement. The Court recognizes that this is, however, a potential violation if the mounds of dirt are not used as part of the final grading.

*6. Section III, Page 6: White Cloud Failed To Obtain a Joint Wetlands Permit from the Virginia Marine Resources Commission and the U.S. Army Corps of Engineers Regarding the Bridge*

Section III, Page 6, of the Conservation Easement provides that:

> The Grantor states and agrees that the uses and practices as permitted herein, though not intended as an exhaustive recital of the permitted rights, are hereby deemed to be consistent with the Purpose of this Easement, subject to the stated restrictions. *The exercise of these rights, as well as others found to be consistent with the Purpose of this Easement shall be in full accordance with all applicable local, state, and federal laws and regulations, as well as in accordance with the Purpose of this Easement.*

WAT argues that White Cloud violated this provision by not obtaining a wetlands permit for the bridge. White Cloud argues that it has not received any notice of a violation of any law. White Cloud also represented that it is in the process of getting a permit.

The Court recognizes, as with item 2, that violations relating to the bridge were not raised in WAT's Complaint. Nevertheless, this violation is something that may be easily remedied. At present, White Cloud has not complied with the law requiring that a wetlands permit be obtained prior to the construction of the bridge. The Easement requires them to be in compliance. The evidence supports that this is something that can be corrected by now obtaining a permit. Accordingly, the Court finds that White Cloud has presently not complied with Section III, Page 6, of the Conservation Easement for failure to obtain a wetlands permit for the bridge; however, this failure to comply may be cured by obtaining such permit, which would then bring them into compliance.

*7. Section 3.12: There Were Changes, Disturbances, and Impairments Made to the Little River for the Bridge and the Unnamed Tributary for the Underground Utility Service without the Prior Written Permission of WAT*

Section 3.12 of the Conservation Easement provides, in part, that:

> Any change, disturbance, alteration, or impairment of any watercourse or wetlands within and upon the Protected Property, shall be undertaken with prior written approval of Grantee. The development and maintenance of those water

resources and wetlands on the Protected Property necessary to wildlife, private recreation, farming, and other agricultural uses permitted by this Easement are essential to the conservation values being protected hereby. Said development and maintenance shall not significantly impair any of the water resources or wetlands, or natural water courses and shall not infringe on the Purpose of this Easement. Permitted activities shall include, but are not limited to, development, restoration, and enhancement of water resources, bank stabilization measures, stream and watercourse restoration, as well as the construction of fish ponds or lakes with prior written approval of Grantee.

WAT argues that White Cloud violated this section because it did not seek approval prior to building the bridge and installing the utility line, which impaired a watercourse. WAT also put on testimony as to why the reserve drain field violates this section.

Section 3.12 must be reconciled with the other provisions of the Easement. Section 3.3A provides that "[n]o permanent or temporary building or structure shall be built or maintained on the entirety of the Protected Property other than . . . (v) private roads and utilities serving permitted buildings." With respect to utilities, Section 3.4 specifically provides that:

> The existing wells, septic, and other utility systems may be maintained on the Protected Property, and the Grantor may place and maintain additional wells, septic, and other utility systems for permitted structures on the Protected Property. Any new septic system must be located a minimum distance of two hundred (200) feet from any wetland, or perennial stream, or in accordance with existing governmental regulations, whichever is the greater distance. The Grantor may bury or otherwise camouflage any and all utility systems serving the Protected Property.

Although Section 3.12 seems to require permission for any change of any watercourse or wetlands, Sections 3.3A(v) and 3.4 specifically allow the placement of wells, septic, and other utility systems for permitted structures, as long as they meet certain criteria, such as being a minimum distance of 200 feet from a perennial stream or wetland.

With respect to the drain fields, WAT's expert, Michael Rolband, testified that the primary drain field is not on a protected area, but WAT's exhibit number 44 showed a "reserve" drain field that is within 200 feet of a wetland or stream. A reserve drain field is required in the event of the primary drain field failing. Nothing for the reserve drain field has been

constructed yet. The Court finds that, although not a current violation, it would be a violation of Section 3.12 of the Easement for White Cloud to use the designated reserve drain field. Should White Cloud require the use of a reserve drain field, it will need to find a location that is not in violation of the Easement.

With respect to the utility line, WAT's exhibit number 45, a photo, depicts gravel across a stream. See also WAT's Exhibit # 32. The evidence suggests that this was done as a part of burying a utility line, and WAT's expert stated that it impacts the flow of the stream. It is noteworthy that, in Section 3.4, only the construction of a new septic system has the restriction of not being within 200 feet of a perennial stream or wetland. There is no such restriction on White Cloud with respect to utility lines. The key issue is the impact of the utility line on the stream. It appears that the impact is a result of construction. WAT's expert stated that it currently impacted the flow level but that, if it was properly installed, there would be a minimal impact. The Court finds, therefore, that White Cloud can correct this and that they are required to do so to comply with the Easement.

With respect to the bridge, WAT's expert, Mr. Rolband, offered opinion testimony that the box culvert crossing Little River is a disturbance to a watercourse because it constricts the stream and increases velocity. See also WAT's Exhibit # 45 showing the box culvert. White Cloud exhibit # 82, the Monitoring Inspection Form from April 12, 2012, notes the addition of the bridge but does not list the bridge as a potential threat to the property's conservation values. The Court finds, as with item 2 above, that WAT did not contend anywhere in its Complaint that the bridge was in violation of the Conservation Easement and, therefore, WAT is precluded from raising this argument at trial.

*8. Section 3.3(A): The Building Exceeds 4,500 Square Feet of Ground Area*

This is one of the main issues in this case. Section 3.3(A) of the Conservation Easement provides, in relevant part, that "[n]o farm building or structure on the Protected Property shall exceed four thousand five hundred (4,500) square feet in ground area." Although the Easement does provide the scale in this instance, the Easement does not define the term "ground area."

WAT argues that the building exceeds 4,500 square feet of ground area and is in fact 5,762 square feet. WAT called an expert, Michael Rolband, who explained that, in his opinion, the ground area would include the area covering the ground as observed from above, including the cantilever portions of the building and the decks supported by piers. See WAT's Exhibit # 47. White Cloud's expert, Kip Williams, who was White Cloud's architect, disagreed and found the ground area to be less than 4,500 square feet. In his opinion, the ground area only includes the portion of the

building on the ground. In other words, the area where there is a foundation. DU's attorney, Jamie Brown, during his deposition, admitted that he could understand Ms. McCloud's interpretation of ground area, though he had a different interpretation of ground area. Brown Deposition, Page 210. Mr. Brown also admitted that he did not tell Ms. McCloud that he disagreed with her definition of ground area. *Id.*

It does not appear that there is a clear definition in the industry as to the term ground area. There is no doubt that White Cloud used its architect creatively to achieve a foundation designed at just under 4,500 square feet. This is the area on the ground. By the use of cantilevering and the addition of decks supported by piers, White Cloud has created additional areas above the ground area. This certainly could have been contemplated and addressed in the Easement, but it was not.

The Court cannot find that the term "ground area" has the certain meaning that WAT claims. The Court believes that the interpretation of White Cloud's architect was more consistent with the language of the Easement. Although this could lead to absurd results based upon the hypothetical suggested on cross-examination, this is not the case here. Here, the evidence is that the foundation is under 4,500 square feet, but White Cloud has added some piers to create more space above ground. There was no evidence offered with respect to the additional square footage of the piers used. Moreover, the term must be strictly construed and the doubt resolved in White Cloud's favor. Accordingly, the Court finds that White Cloud is not in violation of Section 3.3(A) of the Conservation Easement.

*9. Section 3.5: A New Private Road Was Impermissibly Built to a Non-Permitted Building and Constructed from Non-Permeable Materials*

The Court has already addressed the issue of whether the building is permitted. The remaining issue relates to the construction material. Section 3.5 of the Conservation Easement provides, in relevant part, that:

> The Grantor reserves the right to maintain and replace existing roads at the same location with roads of like size and composition. All new private roads shall be constructed in accordance with Best Management Practices of the Virginia Erosion and Sediment Control Law in order to control erosion and protect water quality. These new private roads shall provide access to the permitted structures using permeable materials (e.g. sand, gravel, crushed stone).

WAT argues that the private road built by Ms. McCloud does not go to a permitted structure and that it is not comprised of permeable materials. WAT's expert, Mr. Rolband, testified that the 21A, a type of crushed stone, does not allow water to permeate one half inch per hour or greater and,

therefore, is not permeable. White Cloud's expert, Mr. Jeffries, testified that this is the typical gravel road used for agricultural and rural settings and that White Cloud followed all laws on sediment control. The Court believes that the language of Section 3.5 controls. It specifically references gravel and crushed stone and does not differentiate them. White Cloud here used crushed stone.

Although 21A is crushed stone with 6-12% fine materials, the parties did not incorporate any particular guide to what is permeable. The argument that this crushed stone is not permeable as required is rejected. No scientific test was performed on the material that was applied. All that was offered was an opinion that in general 21A does not allow water to pass at the rate of one half inch per hour. The Court, therefore, finds that the evidence was insufficient to show that the actual road was not built of permitted permeable materials. Accordingly, the Court finds that White Cloud is not in violation of Section 3.5 of the Conservation Easement.

10. *Section 3.15: Several Hedgerows Were Impermissibly Removed*

Section 3.15 of the Conservation Easement provides that:

> The Grantor reserves the right to cut, remove, or otherwise destroy vegetation on the Protected Property to the extent customary, including without limitation the routine upkeep, maintenance, landscaping, planting of trees, shrubs, flowers, and other native and non-native plant species, consistent with the Purpose of this Easement, within the area of the permitted structures on the Protected Property. Subject to other provisions of this Easement, the Grantor reserves the right to selectively cut, burn, mow, and clear trees and vegetation in areas designated "Fallow Fields," on the Sketch Plat, Exhibit A, for waterfowl habitat enhancement and protection, as well as the cultivation of wildlife food plots as per Section 3.13. The Grantor reserves the right to undertake agricultural activities pursuant to Section 3.10 and activities for fire protection, including the right to construct firebreaks as necessary. Tick and mosquito control may also be undertaken in accordance with Section 3.11 herein. All such activities shall be undertaken in a manner which protects the conservation values of the Protected Property and Purpose of this Easement.

WAT argues that hedgerows were impermissibly removed. Section 3.15 allows White Cloud to selectivity cut, burn, mow, and clear trees and vegetation in areas designated "fallow fields" on Exhibit A of the Easement. White Cloud also is allowed to undertake "agricultural activities" pursuant to Section 3.10. Section 3.10 defines permitted agricultural activities as

including but not limited to "farming, horticulture, viticulture . . . . " WAT offered its expert, Michael Rolband, as to the removal of the hedgerows. The Court's recollection of his testimony is that he stated that one, maybe two, hedgerows were cut outside the fallow field and that he did not know the reason for this. WAT's exhibit number 39 shows aerial photos of the removed hedgerows. The Monitoring Inspection Form from April 12, 2012, also noted the clearing but no violation was cited. White Cloud's Exhibit # 82. Perry Griffin, Ms. McCloud's business partner, testified for White Cloud that he oversaw the cutting and that the removal of one of the hedgerows had to do with agricultural efficiency and not with the building being constructed. Also, separate wildlife habitats were created nearby.

The Court finds the evidence insufficient to find that White Cloud violated Section 3.12 of the Easement. Certain hedgerows were removed for the purpose of constructing a permitted building, which is allowed under Section 3.12, though the area allowed to be cut for a permitted structure is not defined in terms of scope. Additionally, the Court is unable to delineate on the photo introduced as WAT's exhibit # 39 the fallow fields shown on Exhibit A to the Easement. WAT did not put on an expert to show specifically that the hedgerow(s) cut outside the fallow fields was done for an impermissible reason. The burden is on WAT. Accordingly, the Court finds that White Cloud is not in violation of Section 3.12 of the Conservation Easement.

11. *Section 1.1, Whereas Clause, Page 5, Sections 3.19, 4.1, and 4.14: The Facilities and Their Use Fail To Retain the Property in Its Condition as Established by the Baseline Document Report*

Section 3.19 of the Conservation Easement provides:

> The parties recognize that this Easement cannot address every circumstance that may arise in the future. The parties agree upon the Purpose of this Easement as set forth in Section 1.1: to retain the Protected Property in perpetuity predominately in its natural, scenic, and open condition as evidenced by the Report, for conservation purposes as well as permitted agricultural pursuits and to prevent any use of the Protected Property which will impair significantly or interfere with the conservation values of the Protected Property, its wildlife habitat, natural resources, or associated ecosystems. The Grantor has the right to engage in any and all acts or uses not expressly prohibited herein that are not inconsistent with the Purpose of this Easement. Any use not reserved in Section III which is inconsistent with the Purpose of this Easement or which materially threaten the Purpose of this Easement is prohibited. In the event that there is a dispute between the

Grantor and the Grantee as to whether or not an activity or use is prohibited under this Section III, the parties will arbitrate the matter in accordance with the provisions of Section 4.17 of this Easement.

Section 4.1 of the Conservation Easement provides:

The parties intend that the Report shall be used by Grantee to monitor Grantor's future uses of the Protected Property and practices thereon. The parties further agree that, in the event a controversy arises with respect to the condition of the Protected Property or a particular resource thereof, the parties shall not be foreclosed from utilizing any other relevant document, survey, or report to assist in the resolution of the controversy. Grantor and Grantee recognize that changes in agricultural technologies, including accepted farm and forest management practices may result in an evolution of agricultural activities on the Protected Property. Such evolution shall be permitted so long as it is consistent with the Purpose of this Easement, and does not in any way materially impair or interfere with the conservation values of the Protected Property.

Section 4.14 of the Conservation Easement provides:

In the event there is a breach of the terms of this Easement by the Grantor or by a third party acting at the direction of, with the permission of, or under the control of the Grantor, the Grantee shall have the right to notify the Grantor in writing of such a breach, and the right to enforce by proceedings at law or in equity the covenants hereinafter set forth, including, but not limited to the right to require the restoration of the Protected Property to its condition on the date of this Easement as evidenced by the Report. Upon such notice, the Grantor shall have thirty (30) days to undertake actions, including restoration of the Protected Property, that are reasonably calculated to correct swiftly the conditions constituting such breach. If the Grantor fails to take such corrective action, the Grantee may, at its discretion, undertake such actions, including appropriate legal proceedings, as are reasonably necessary to effect such corrections by Grantor. The cost of such corrections, including Grantee's expenses, court costs and reasonable legal fees will be paid by the Grantor, provided it is determined that the Grantor or a third party acting at the direction of, with the permission of or under the control of the

Grantor, is responsible for the breach. Nothing herein shall be construed to entitle the Grantee to institute any proceedings against the Grantor for any changes to the Protected Property due to causes beyond the Grantor's control such as changes occurring due to natural causes or unauthorized wrongful acts of third parties.

Section 4.1 specifically allows reference to the relevant documents, surveys, or reports. WAT contends that this only refers to materials that were in existence at the time the Easement was entered. White Cloud, on the other hand, feels that current information can be used. The Court finds that no time limitation was inserted by the parties, so it can include current information. The Court believes this to be logical, given that if, for example, a USDA survey on erodible soils changes, then it could be updated. This conclusion is further supported by the next sections which acknowledge changes in agricultural technologies. Agriculture may have started with hand tools but now includes large pieces of equipment. As this is a permanent covenant, it follows that reference to current relevant documents, surveys, or reports may be required.

Scott Yaich, an ecologist and biologist, offered opinions on the significant negative impact on wildlife and resources as a result of the building site, parking lot, drainage, removal of vegetation, road building, and traffic. However, many of these activities are permitted activities. Moreover, it is well known that many of the permitted structures could impact wildlife resources. Mr. Yaich himself acknowledged that only 5-10% of the property has been affected and building anywhere on the property would have a negative impact. Even row cropping has a negative impact on some wildlife.

White Cloud seems to rely on the limited scope and marginal cumulative effect of its activities. White Cloud offered Mr. Irrey, a biologist, and he opined that there was no significant impact of the utility crossing, culvert, or road crossing. White Cloud also offered Mr. Sareen, a biologist, who opined that there were marginal effects from the improvements and that only a small percentage of the property was impacted. He noted that the land had already been altered by the agriculture and man-made wetlands and roads and that overall there was a *de minimis* effect.

The Court finds that, under the Easement, White Cloud was not required to retain its property in the condition established by the Baseline Document Report to the extent that it has engaged in permitted uses. Though White Cloud's uses are restricted by the parameters set forth throughout the Easement, it does not follow that White Cloud may not use the property in any way that might impact the property. As noted, placing a building, which is clearly allowed under the terms of the Easement, anywhere would have some negative effect on some habitat on the property. Accordingly, in consideration of the evidence presented, the Court cannot find that White Cloud's use of the property violates the above referenced sections.

12. *Section 3.1: The Facilities and Their Use Constitute Impermissible Commercial Recreational Use*

Section 3.1 of the Conservation Easement provides that:

> Industrial and commercial activities other than the following are prohibited: (i) agriculture, silviculture, viticulture, horticulture, and equine activities, (ii) temporary or seasonal outdoor activities which do not permanently alter the physical appearance of the Protected Property, and which are consistent with the conservation values herein protected, (iii) activities which can be and in fact are conducted within permitted buildings without material alteration to the external appearance thereof. Temporary activities involving one hundred (100) people or more shall not exceed seven (7) days in duration without prior approval of the Grantee. Notwithstanding any other provision of this Easement, no commercial recreational use (except for *de minimis* commercial recreational uses) shall be allowed on the Protected Property.

The testimony was that Ms. McCloud has used the Chrysalis property in the past for music festivals, weddings, classes, and other events and has expressed an intent to use the property at issue here for similar events. WAT argues that these types of events are prohibited under Section 3.1.

As stated earlier, the Court believes that there must be a nexus between the use of the farm building and the farming and agricultural activities taking place on the property. See the discussion of this point in item 1. Although Section 3.1 allows for temporary activities to take place on the property, the Easement expressly prohibits commercial recreational use, except for *de minimis* commercial recreational uses. This specific provision limits the former enumerated uses provided for in Section 3.1, as well as the other provisions in the Easement. The easement creates no bright line between a permitted commercial activity and a prohibited commercial activity. White Cloud may have only a commercial motive in attracting patrons to the property. But in the process, it has an incentive to create an attractive, comfortable environment to encourage sales. Some patrons may come to make a purchase and leave. Other patrons may have a mixed motive to purchase wine but in the process to relax and enjoy the setting that has been created. There is no limit as to duration contained within the easement. It is not reasonable to try to fashion a test that examines the subjective motivation of each patron that arrives and determine that the threshold for commercial recreational use has been met. However, the longer a patron is encouraged or allowed to remain, it may be easier to determine that the use is more likely to be a commercial recreational use from an objective standpoint. The evidence did contain some proposed uses. The Court finds that music festivals, in

which customers pay to visit the property to listen to music and purchase goods from vendors, are both commercial and recreational in nature. These types of events as described in the evidence would therefore be prohibited by the Easement. They exceed the tasting and sale of wines permitted within the scope of commercial agriculture. The Court also finds that weddings and classes are recreational in nature and, to the extent that there is a fee associated with these events, are commercial in nature. Such events would also likely be prohibited unless they are legitimately *de minimis* uses. The Court cannot give an advisory opinion on what would be a *de minimis* use. The Court also cannot anticipate all future uses of the property; however, White Cloud is to be guided by these examples in determining whether other uses would be appropriate under the terms of Section 3.1. Accordingly, the Court finds that certain of White Cloud's intended uses may violate Section 3.1 of the Easement.

13. *Section 3.1: Manufacturing, Retail, and Public Events Are Not Commercial or Industrial Agriculture or Viticulture*

These issues are addressed under items 1 and 12 above.

14. *Sections 1.1, 2.1, 3.10, and 3.19: The Facilities and Their Use Are Inconsistent With and Significantly Impair and Interfere with the Conservation Values of the Easement and the Wildlife Habitat, Natural Resources, and Associated Ecosystems on the Property*

Section 2.1 of the Conservation Easement provides:

> The Grantee shall have the right with prior notice to Grantor to enter the Protected Property for the purposes of inspection to determine compliance with the terms and conditions of the Easement and to prevent any activity on or use of the Protected Property that is inconsistent with the Purpose of this Easement. The right of entry and access herein described does not extend to the public or any person or entity other than the Grantee, its agents, employees, successors, and/or assigns.

Section 3.10 of the Conservation Easement provides:

> Permitted agricultural activities include but are not limited to: farming, horticulture, viticulture, including nursery, aquaculture, animal husbandry, and cattle and livestock activities, provided the same are conducted in a manner consistent with the Purpose of this Easement. Preference should be given to undertaking agricultural activities in the locations designated "Agricultural Area" on Exhibit A, the

Sketch Plat, which generally represent the agricultural fields in cultivation on the date of this Easement. The Grantor reserves the right to locate, construct, improve, and maintain watering facilities and ponds, and the Old Farm Pond shown on Exhibit A, the Sketch Plat may be maintained and repaired as necessary. Permitted agricultural activity must be consistent with the maintenance and enhancement of soil composition, structure, and productivity, and may not result in significant degradation of any waters or have a significant effect upon fish or wildlife, their natural habitat, or upon the natural ecosystem and its process.

The testimony and evidence with respect to these issues is encompassed in the testimony and evidence discussed above in addressing the other items. As stated in item 11, any use of the property will in some way impair some habitats on the property. The Easement, however, clearly allows for the construction of certain buildings, roads, and utilities, among other things. The testimony was that only roughly five percent of the property is affected by White Cloud's uses. The Court believes that this is consistent with the "predominant" uses outlined in Section 1.1. Moreover, as noted above, one of the very purposes of the Easement allows permitted agricultural uses. The Easement also allows for commercial agricultural uses of the property. Therefore, based on the evidence presented, the Court cannot find that the facilities and their uses, except as noted in this opinion, are inconsistent with and significantly impair and interfere with the conservation values of the Easement and the wildlife habitat, natural resources, and associated ecosystems on the property. Accordingly, the Court finds that White Cloud has not violated Sections 1.1, 2.1, 3.10, and 3.19 of the Easement.

The Court must also decide whether the equitable defenses of laches, estoppel, or waiver apply. The Virginia Supreme Court has stated the following as the law with respect to laches:

> "*Laches* is such neglect or omission to do what one should do as warrants the presumption that he has abandoned his claim, and declines to assert his right." However, " `[there] is no absolute rule as to what constitutes laches or staleness of demand, and no one decision constitutes a precedent in the strict sense for another; each case is to be determined according to its own particular circumstances.' 30 C.J.S., *Equity*, § 115, page 528." The burden of proving that a party is guilty of laches is upon the one asserting laches.

*Pittman v. Pittman*, 208 Va. 476, 479, 158 S.E.2d 746 (1968) (internal authorities omitted). In this case, there was little testimony and argument

with respect to White Cloud's claim of laches. Although there was testimony that no one told Ms. McCloud she could not proceed with the various aspects of her vision, there also was no evidence that WAT did anything to show that it was abandoning any claim that it may have. Moreover, the Monitoring Inspection Forms introduced into evidence specifically state that they do "not waive Grantee's rights under the Conservation Easement, cannot be relied upon by Grantor to estop enforcement of the Conservation Easement, used as an estoppel certificate, or to support a defense of laches or limitations, and in no way modifies or amends the Conservation Easement." See, e.g., White Cloud's Exhibit # 30. Accordingly, the Court finds that White Cloud has not met its burden of proving that WAT is guilty of laches.

With respect to estoppel, the elements are as follows:

> (1) There must have been a false representation or concealment of a material fact; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party should act upon it; and (5) the other party must have been induced to act upon it.

*Trayer v. Bristol Parking, Inc.*, 198 Va. 595, 604-05, 95 S.E.2d 224 (1956) (internal authorities omitted). White Cloud did not argue estoppel in its closing argument; however, an estoppel defense was hinted to during the course of the trial. The Court recognizes that Jenifer Christman and David Marone may have made statements that led Ms. McCloud to believe that her actions and plans did not violate the Conservation Easement. However, there was no evidence presented that anyone on behalf of WAT or DU made statements with the intention of inducing Ms. McCloud to act. The evidence showed that White Cloud did not rely on these statements. Ms. McCloud relied on her own interpretation of the Easement. Accordingly, the Court finds that White Cloud has not met its burden of proving that estoppel should apply.

With respect to waiver, the Virginia Supreme Court has observed that "waiver of a legal right will be implied only upon clear and unmistakable proof of the intention to waive such right for the essence of waiver is voluntary choice" and that "the party relying on a waiver has the burden to prove the essentials of such waiver . . . by clear, precise, and unequivocal evidence." *Baumann v. Capozio*, 269 Va. 356, 360, 611 S.E.2d 597 (2005) (internal authorities omitted). As with the defense of estoppel, White Cloud did not argue waiver at closing. There was no evidence presented showing that it was the intent of WAT to waive any legal rights. In the absence of evidence showing that it was the intent of WAT to waive their legal rights,

the Court cannot find that White Cloud has met its burden of providing a defense of waiver.

Finally, with respect to White Cloud's Counterclaim, the Court finds that White Cloud has not met its burden of proving the Conservation Easement unenforceable. White Cloud's request for an injunction to enjoin WAT from prohibiting White Cloud from using Lot 1 for agricultural uses consistent with the Loudoun County Zoning Ordinances is denied. While White Cloud may have to comply with local zoning ordinances, this compliance does not guarantee that White Cloud is in compliance with the separate requirement of the Easement. Moreover, most of White Cloud's requests for injunctive relief are rendered moot by the above rulings.

## Conclusion

The Court finds that, with the following exceptions, WAT has failed to meet its burden of proving that White Cloud has violated the Conservation Easement. With respect to items 1 and 12 above, certain potential uses of the farm building may be prohibited as set forth more fully above. With respect to item 5 above, White Cloud must use the mounds of dirt in the final grading to be in compliance with Section 3.6 of the Easement. With respect to item 6 above, White Cloud must obtain a wetlands permit for the bridge to comply with Section III, Page 6, of the Easement. With respect to item 7 above, White Cloud must properly install the utility line to comply with Section 3.12 of the Easement.